## JAMES B. ELLINGTON v. ELIZABETH ELLINGTON.

1. SEDUCTION—ACTION PER QUOD SERVITUM AMISIT.—There was no express action given for the wrong done a parent for the seduction of his child; and therefore a special action on the case has been allowed by the courts, founded on a legal fiction, for a "loss of services," but in reality to punish the seducer in damages, for the dishonor and distress which the outrage brings upon the parent; and a similar action is allowed to the master of a servant, if debauched or beaten, for any special damages thereby actually occasioned.

2. GENERAL PRINCIPLES AND DISTINCTIONS.—Distinctions arising from age or nonage of daughter, her apprenticeship to the defendant or to another, or her absence from her father's service and control, with or without his consent, death of the father pending or before suit, etc., and general principles applicable thereto, considered and authorities cited.

3. IMPROVED THEORIES OF THE LAW.—In spite of the difficulty with which the judicial mind can ever emancipate itself from forms sanctioned by age and long experience, it is manifest that courts cannot stand still in the march of improvement; the idea that a parent's right of action for the defilement of his child rests only upon a supposed loss, by a master, of the services of a servant, originating, as it did, in a rude age, has gradually given away to more enlightened and refined theories.

4. MODERN PRINCIPLE.—For the defilement of a minor daughter, a parent may recover, as a parent, damages for the outrage, dishonor and injury thereby inflicted upon the child, parent and family, upon the principle that it is the duty of the parent to protect the person and morals of his child and of his family.

ERROR to the circuit court of Atalla county. SHACKLEFORD, J.   •

This was a suit instituted in the court below, at the March term, 1868, by Elizabeth Ellington against J. B. Ellington, to recover ten thousand dollars, damages, for the lost services of Virginia A. Ellington, aged six-

teen years and her daughter, occasioned by the seduction and defilement of the said Virginia by the defendant in 1866. To the action defendant plead, 1. General denial ; 2. The emancipation of the said Virginia by plaintiff at the time ; 3. That Virginia was free at the time and in her own rightful service ; 4. Virginia was at the time sent forth to shift for herself ; 5. That Virginia was at the time in the service of the defendant ; 6. Virginia did not live with and was not in the service of the plaintiff at the time ; 7. Virginia was at the time permanently residing from plaintiff and her service, and supported herself, and paid all her expenses and losses in the premises ; 8. Defendant paid and discharged all expenses, costs and value of lost time, and the same was accepted as such ; 9. That plaintiff could not recover for lost time and services of Virginia, occurring after her defilement, if taken by plaintiff with full knowledge of her condition ; 10. Plaintiff was not at the time deprived of the services of Virginia ; 11. Plaintiff was not entitled to the services of Virginia in law, or by contract or agreement.    There was a general 'demurrer to all the pleas, except the 9th, 10th, 11th, which was overruled except as to the 4th and 8th, and as to them sustained.    Whereupon, plaintiff replied to all the said pleas, and issue was joined thereupon.    The jury returned a verdict for plaintiff for one thousand dollars.

The evidence on the trial, so far as material to the questions presented, is in substance as follows :

The plaintiff, the mother, testified that the girl was about eighteen years of age and had never been married ; that she had a child in 1867 ; that the plaintiff in error admitted to be his child ; that he was the uncle of her daughter, and that about the latter part of the year 1865, she permitted her daughter to go and live with her uncle ; that she went there on a visit, and to learn to double-weave, but that she continued to live at his house and to make it her home until about two

months before her confinement in August, 1867, when she returned to her mother's house, and was there delivered of a child; that some considerable part of the time the mother was not keeping house, but resumed housekeeping in February, 1866, and had with her her four children beside the daughter seduced; that she never called for or requested said daughter to return to her or her house or service, and never claimed her services and received nothing for them, but never relinquished her right to them; that the daughter came occasionally during the time to see her mother on a visit, staying a few days each time; that the daughter ate, lodged and had her entire support and employment at her uncle's house for about eighteen months before her confinement, and milked and aided in the ordinary household business, and her uncle clothed, fed, lodged, schooled, supported and maintained her as one of his family while she remained there, and until two months before her confinement, and had no other home, residence or business during that time, and was entitled in her own right to whatever she earned or made there.

Virginia, the daughter, testified that she was twenty years old on the 10th of August, 1869; that she went to live with her uncle on the 25th of December, 1865, and left there in June, 1867, and during that time had no other home; assisted in general household duties during that time; was clothed, fed, lodged, sent to writing school, and lived as a member of the family with her uncle until June, 1867, and had no other home or business during that time until a difficulty was raised in the family about her pregnancy, about June, 1867, when she left for that cause and went to her mother's house to be confined. She fully describes the particulars of her seduction by her uncle, the plaintiff in error. She further testified that she staid at defendant's house until she was driven away by his wife in June, 1867, but for which she would have remained there, and that

her home was with him and his family, and that she had none other; that she went there to stay only a few days, but was persuaded by his family to remain and make it her home, which she did until driven away by his wife; that he promised to treat her well, provide for and take care of her, and always treated her kindly; that she did only those things about the house common for children to do, and looked upon it as her home, and he supported her and sent her to a writing school, and treated her as a member of the family; that her mother never claimed her services or return home, nor did she labor in any way for her mother during her stay her uncle's, but went back to her mother under the circumstances before mentioned, and that after her confinement and the death of her child, she went to Arkansas to live, and remained there until she was written to to return and testify in this case. When she went back to her mother's, she did so to be confined, and to serve her while there as best she could. When she left to go back, plaintiff in error gave her one hundred dollars in gold to supply her wants and expenses of confinement, and said he would pay more if necessary. She gave the money to her mother, telling her for what purpose it was given, and her mother accepted it under the circumstances.

Rebecca Ellington, wife of plaintiff in error, testified, that in the fall of 1865, the mother came to witness' house and stated that she had quit housekeeping, and desired a home for Virginia, and wished witness to take her and raise her and give her a home, which, with some reluctance, her husband consented to do. She came in December, 1865, and made his house her home until witness drove her away in June, 1867. She was supported in all respects as one of the family while she stayed there, had no other home or residence; engaged in the ordinary household duties as a member of the family, visited her mother two or three times, and was

visited by her mother a few times during the period, and not a word was said about her going back to her mother, or any claim to her service. When witness discovered her pregnancy and charged her with it, she said witness' husband did it, and witness drove her from her house. Witness also stated that Virginia, by her under circumstances of improper intimacy with other men during her stay there.

Other witnesses testified in effect that Virginia had her home at the house of plaintiff in error, who was willing to take care of, raise and provide for her, and that her mother consented to the arrangement.

Defendant moved the court for a new trial, which was overruled, wherefore he sues out a writ of error, and assigns the following errors:

1. The court erred in granting the charges given for plaintiff in the court below.

2. The court erred in refusing the 3d and 11th instructions asked for defendant below.

3. Because the court erred in sustaining the demurrer of plaintiff below, to the 4th and 8th pleas of defendant below.

4. Because the jury found contrary to the instructions, law and evidence.

5. Because the circuit court erred in not granting defendant below a new trial, and overruling his motion in that behalf.

*Robert S. Hudson*, for plaintiff in error.

A parent may maintain an action for an assault upon or injury done to his child, whilst such child remains part of his family. The strict ground of the action is the loss of the service which the child might have performed for the parent; and though it has been holden, that it is not necessary to show in fact that the child was accustomed to perform any material menial service or office, or other service in the family, but that it is

sufficient if he or she were living in the parent's house, and under his protection, yet it must be proved that the child did so reside. Norris' Peake, 543, 544; Jones v. Brown, Peake Cas. 253; McDaniel v. Edwards, 7 Ired. 408; Bartley v. Richtmyer, 4 Comst. 38. This last case reverses the case in 2 Barb. 182.

A parent whose daughter has a permanent and fixed residence in another family, cannot maintain an action against the person who seduces her, though she be under age. Norris' Peake, 544; Dunn v. Peel, 5 East. 45. In this case, however, the person with whom she resides may maintain the action. Fores v. Wilson, Peake Cas. 55; Edmonson v. Machel, 2 T. R. 4; Irvin v. Dearman, 11 East, 24; Norris' Peake, 544.

When the daughter resides with the parent, though she be above the age of twenty-one years, he may maintain the action. Boothe v. Charlton, 5 East, 47; Burnett v. Alcot, 2 T. R. 156. And so also he may, if her general residence be at his house, and she is seduced while on a visit at the house of another, with his consent. Johnson v. McAdam, 5 East, 47; Norris' Peake, 544.

A mother, as such, has no legal authority over a son, and is not entitled to his services while he lives with her. Commonwealth v. Murray, 4 Binn. 487; Burke v. Phipps, 1 Root, 487; Satterthwaite. v. Dewhurst, 4 Dong. 315; 5 East, 45.

Neither does the concurrent existence of any other relation than master and servant, such as that of parent and child, or other relation, affect the action, for such relation will not aid to support the action, if the party seduced was actually emancipated and free from the control of the plaintiff when the injury was committed. 4 Selw. N. P. (10th edit.) 1103, 1104; 3 Steph. N. P. 2351–2353; 2 Greenl. Ev., § 572; 11 East, 23; 2 Barb. 182; 5 ib. 661; 2 T. R. 4; Manneville v. Thompson, 2 C. & P. 303; 7 Ired. 408; 4 Comst. 38.

But if she was not in his service in any of these modes, the father cannot maintain this action, though he received part of her wages and she was under age. Carr v. Clarke, 2 Chitty, 260; Postlethwaite v. Parke, 3 Burr. 1878; Grinnell v. Wells, 7 Man. & Gr. 1033.

On the other hand, it has been decided, "that where the daughter was in the domestic service of another person at the time of the injury, though with the intent to return to her father's house as soon as she quit that service, unless she should go into another, the action cannot be maintained. Blaymire v. Haley, 6 M. & W. 55; 3 Burr, 1878; Davis v. Williams, 10 Ad. & El 725, N. S. And much less can it be maintained where she had no such intention of returning. Dean v. Peel, 5 East. 45; Anon. 1 Smith, 333.

The allegation of her relation of servant, and the *per quod servitum*, are material, and must be shown to have existed at the time. Grinnell v. Wells, 7 Man. & Gr. 1033; Logan v. Murray, 6 S. & R. 175; 4 Comst. 38; 7 Ired. 408.

The alleged servant was an orphan, the father being dead. Stewart v. Morrison, 38 Miss. 417. She had no legal guardian. She was liable in law for her own necessary support, education, etc., as all minors and orphans are, and to meet these liabilities was entiled to her own earnings and labors. She was not, by the relation merely, the servant of her mother, nor was her mother, as such, bound to support and maintain her, or entitled, as a matter of right, to her services; nor could the action be maintained upon such relation or even abstract right of service, if such right existed. The reciprocal pecuniary duties and obligations between father and child do not, upon the death of the father, attach as a legal consequence to the mother, but the mother and the orphan are alike, upon the death of the husband and father, emancipated from service, liable for their own support, and entitled to their own earnings and services.

But if it was otherwise, the mother had at the time emancipated the daughter, as she had the clear right to do. 4 Binn. 487; Wood's Inst. 64; 1 Wood. 451; 3 Bl. Com. 453, 454; 3 Bac. 597, 598; 2 D. & E. 159; 1 Bl. Com. 453. Manchester v. Smith, 12 Pick. 113; Nightingale v. Willington, 15 Mass. 272; Burlingame v. Burlingame, 7 Cow. 93; State v. Dorr, 5 Wend. 206; Dick v. Grissom, 1 Freem. Ch. 428, 433, 434. This may be done by the act of the parties, or by operation of law. It may be the result of an express agreement, or may be implied, showing a recognition of the child as a person *sui juris*. But whether the mother was or was not, as a mere legal question, entitled to the earnings and services of the child, or had or had not, expressly or impliedly, emancipated her, she was most clearly and unquestionably not, at the time of the alleged injury, nor for a year and a half before that time, a member of the family of the mother, or residing with or in the service of the mother, but was residing with and in the service of the plaintiff in error, and had been so for about eighteen months continuously before her impregnation, and remained there and in such service for some time afterwards, and until the wife of plaintiff in error discovered her condition, and expelled her from her home and service.

The English law, upon this subject, has been adopted in many of our states. 7 Ired. 408. While the New York courts departed from it in many respects for a time, they have, finally, measurably returned and adopted it. 4 Comst. 38.

The court below erred in sustaining the demurrer of the plaintiff below to the fourth and eighth pleas of defendant below. Commonwealth v. Murray, 4 Binn. 487; Burke v. Phipps, 1 Root, 487; 4 Doug. 315; 5 East, 45 (*n*); Wood's Inst. 64; 1 Wood. 451; 1 Bl. Com. 453; 3 Bac. 597–8; 2 D. & E. 159; Carter, 215; Fitzgib. 176; Gilb. 74; 1 Burr. 566; 3 Burr. 1801.

Upon the death of the father, and the orphan being or becoming of the age of fourteen years, it may select and follow its own guardian and custody of itself and estate, despite a living mother, under our statute, as is clear by our statute, and is settled in the case in 4 Binney.

*A. H. Handy,* for defendant in error.

I. The first ground of error is based upon several propositions, of law insisted on in behalf of the plaintiff in error; all of which, we submit, are untenable.

These propositions are, in substance, as follows:

1. " That a parent, whose daughter has a permanent and fixed residence in another family, cannot maintain an action against the person who seduces her, though she be under age."

In support of this rule, the following English authorities are relied on: Norris' Peake 543–4; Dean v. Peel, 5 East, 47; 7 Ired. 408; 4 Comst. 38.

It is not denied that this is the English rule, though its applicability is denied in this case, where the testimony of the mother shows that she never relinquished her right to the infant daughter's services, and although she regarded the house of the plaintiff in error as the child's home. For there was no contract or obligation of the daughter's service with, or to him, either by the mother or daughter. Her stay at his house was purely gratuitous, and she had a perfect right to quit it, or her mother to take her away, at any time. This right, in the absence of a contract of service to plaintiff in error, remained to the mother; and it was her duty to exercise it at discretion, and at any time, though the daughter went, by the mother's consent, to the uncle's house with the intention of making it her home. For it was the mother's duty to take care of and control her fatherless child. 2 Kent's Com. 203, 205 (marg).

The relation of master and servant between the uncle

and his niece, could only subsist by contract binding on both parties.. Kent's Com. (8 edit.) 258 (marg.); 1 Bl. Com. 425. There was no contract on his part to pay her wages; or, on her behalf, to render services and to continue in his service; and neither of them could, under the facts shown, have recovered from the other for breach of this duty, or have enforced its continuance.

Nor is there any implied contract of service. The rule in this respect is different with regard to strangers from what it is as to near relatives residing in a family In the former, the presumption of wages to be paid, will be presumed, and a contract of service will be implied; but as to near relatives, residing in a family, the rule is otherwise, and no contract is implied. Chitty Cont. (10 Am. ed. by Perkins) 624, and cases in note (*i*); 9 Barr. (Pa.) 309.

Both parties recognized the fact that there was no legal right founded on an obligation of service to the plaintiff in error, for she was driven from his house, and her residence at her mother's house was resumed, her residence with the plaintiff in error being wholly gratuitous and permissive.

The English rule is founded on a legal fiction—that the foundation of the action by a parent, for the seduction of his daughter, is, that the parent must be entitled to her services at the time of the seduction, which have been lost to the parent by the seduction; and this rule is founded in good reason, in case of an adult daughter. And, consequently, it is settled in England that the relation of service must be shown to have existed at the time of the seduction; and that when the daughter, an infant, was in the service of another at the time of the injury, though with intent to return to the parent's house when she quit the service, the action cannot be maintained by the parent. Greenl. Ev., § 574; Davis v. Williams, 10 Adolph. & Ellis, 725 (N. S.)

This has been sanctioned in 4 Comst. 38, to its full extent. But it is generally rejected in this country, and the American rule is to the contrary.

Chancellor Kent lays it down as the correct rule that "a parent may maintain the action for the seduction of his infant daughter, though she be living apart from him, and in the service of another; for he has a right to her services, and to claim them, and is legally bound to maintain her, and to bear her expenses as a consequence of her seduction." 2. Kent's Com. 205 (margin), note a (8th ed.); 9 Johns. 387; 10 ib. 115, 116; 5 Cow. 106; 8 Serg. & Rawle, 36; 1 Halst. 322; 5 Harr. & Johns. 27, 34, per Johnson.

The leading English case of Dean v. Peel, 5 East, is denied as sound law in 9 Johns. 390, and 5 Harr. & Johns. 31, 34; and is in opposition to all the American cases above cited, except that in 4 Comstock, so far as the case of an infant is concerned. See note to Mees. & Wels. 6, 57; Bolton v. Miller, 6 Ind. 262, 265; 8 Blackford, 113; 6 Ind. 266. The case cited from 7 Iredell, 408, was a case of seduction of an adult, and is not in point.

The daughter was, in law, under the control and authority of her mother during all her residence at the house of plaintiff in error. 2 Greenl. Ev., § 576. And it is only necessary to show that the mother has the legal right to control the services of her child. Sedgwick on Damages (5th edit.), 543 (margin).

But the doctrine, that in the case of an infant daughter seduced, the right to her services is the test of the right to maintain the action, is unfounded in sound principle. For, as she is a minor, she is presumed to be under the parent's control, and he is entitled to her services, whether she be in his actual service or not. 2 Greenl. Ev., § 576; 5 Harr. & Johns. (Md.) 31, 34.

The entire doctrine of the right to service, founded on the daughter living with another party than the parent,

is a mere fiction of law. Reeve's Dom. Rel. 598, note 1. The English cases hold it in all its rigor, but the American courts have rejected it, in cases of infants, except where it clearly and fully appears that the parent has, by contract and legal obligation, bound himself, and has parted with the right to the control and services of the infant.

But even in such a case, it is submitted that the dictates of justice require that the parent should be entitled to the action in all cases of seduction of an infant daughter. For, though the nominal foundation of the action is loss of service, yet the real ground of it is the ruin of the character of the daughter, the destruction of her peace of mind and happiness, and the disgrace brought upon her family connection. It is for this reason that the slightest right to her services will be sufficient to maintain the action by the parent. And the measure of damages is, not the loss of service, but the injury and ignominy brought upon the daughter, which justify verdicts for the heaviest exemplary damages, resting almost entirely in the discretion of the jury.

This case strongly illustrates the unsoundness of the doctrine of mere loss of services of an infant daughter seduced, as the foundation of the action by the parent. According to the theory of the plaintiff in error, the daughter was in his service; that is, permitted by her mother to reside at his house, which the daughter intended to make her permanent home. Whilst so situated, she was seduced by him to whose care she had been intrusted by her mother. The girl was incapable of maintaining an action for the outrage, because she was *particeps criminis* in law. The mother could not maintain it, because, as is alleged, she was out of her service and beyond her control. The uncle who seduced her, being the only person entitled to her services, as is alleged, could not sue for the injury, because he was

the author of it, and could not sue himself. Therefore, the ruin of the girl must go unavenged, and the guilty author of it go unwhipt of justice, because a fiction of the law debars any one of the power to hold him accountable for the ruin he has inflicted on his father-less infant niece, whom he had pretended to take under his care and protection.

This fiction had its origin in the dark ages, when the child was considered in law merely the servant of the parent, a doctrine which is repugnant alike to parental duty under modern civilization and to the dictates of justice. It is a mere fiction under the circumstances of this case, and is contrary to the policy of our law abolishing fictions of law. Code of 1871, § 576.

2. The second position taken for plaintiff in error is, that the mother, as such, has no legal authority over her infant child, and is not entitled to her services; and for this are cited, 4 Binn. 487; 1 Root, 487; 4 Doug. 315; 5 East, 45; 1 Bl. Com. 453.

This position is contrary to settled doctrine.

" The father, and, on his death, the mother, are gen-erally entitled to the custody of infant children, inas-much as they are their natural protectors for maintenance and education." 39 Miss. 43; 2 Kent. Com. 205; ib. (margin) 203; 16 Mass. 135; 17 ib. 274 (margin); 2 ib. 11; 5 Md. 216 *et seq.*, and all the cases cited above, where the mother has maintained the action for seduction of her infant daughter.

Nor is this right of the mother taken away by the mere right of the infant to select a guardian at 14 years of age. For this right is not shown to have been exercised in this case. But, if it had been, the guar-dian is not entitled to the services of his ward. Such guardian has no control over her person (Code of 1871, § 1202); and the right to choose, if exercised, excludes control of parents only over the child's property (§ 1232).

But the right of personal control, first, the father, and, secondly, the mother, is fully recognized. Ib. § 1202.

3. It is urged that the mother had, at the time of the seduction, emancipated the daughter, and had no control over her or right to her services.

An emancipation takes place where the parent sells, or enters into a valid contract for the sale of the infant's services to another, or where the child is driven off and compelled to work for its own support. In such cases the law implies an emancipation, so as to give the child the benefit of its contracts and labors.

This rule applies generally with respect to third persons with whom the parent had, either by positive contract or impliedly, permitted the child to make contracts, as if *sui juris;* and, in such cases, the acts of the infant will not be disturbed so as to deprive her of the benefit of them; nor will the rights of third persons dealing with the infant, in such circumstances, be interfered with to the prejudice of third persons, and for the benefit of the parent who has forced or allowed the infant to make contracts under such circumstances.

But even this rule is confined to contracts made by the infant, and the infant will not even be allowed to make contracts to its prejudice. 17 Mass. 275 (margin); Nightingale v. Willington, 15 Mass. 272; Chester v. Smith, 12 Pick. 113; Burlingame v. Burlingame, 7 Cow. 93; Shute v. Dow, 5 Wend. 206; Dick v. Grissom, Freem. Ch. 433, 434.

But this doctrine has no application to torts committed against the infant, and especially to such as she is incapable of obtaining redress for, as in case of seduction. And it would be monstrous to prevent a privilege allowed to an infant daughter, for her benefit, and for the immunity of third persons contracting in good faith with her, acting *sui juris,* into a license for her own prostitution and ruin.

The doctrine of emancipation has reference only to the infant daughter's benefit, and to the protection of third persons who are allowed to make valid contracts with her, by the express or implied authority of the parent. It would be an utter perversion of the principles of this doctrine to apply it to torts against the infant; for, in such cases, the parent has no authority to allow the infant to commit torts, nor to give license to third persons to commit torts against her, to her infamy and ruin.

But there was no emancipation here, either express or implied; no contract with the plaintiff in error to deal with the infant as *sui juris*, and make contracts; no driving away of the daughter from the mother's house to shift for herself; but the mother never relinquished her right to services or control, and the daughter simply lived at her uncle's house as a home.

It was a high and sacred duty of the mother, from which she could not absolve herself, to protect her infant daughter from outrage, and to redress the wrongs which caused her ruin, and which the daughter, by the technical rule of law, as a *particeps criminis*, was incapable of doing.   2 Kent. Com. 203, 205 (margin).

If the above views be correct, it is clear that the instructions given for the plaintiff below were correct.

At all events—the case being brought up on the judgment of the court in overruling the motion for a new trial—this court will not reverse the judgment for errors committed on the trial, if it appears that the judgment, on the whole record, is well founded in law. And this is manifestly the case here.   40 Miss. 209. No special exception was taken on the granting or overruling instructions, and such action cannot be assigned for error here.   40 Miss. 320.

II. The second ground of error relied on, in the sustaining of the demurrers to the 4th and 8th pleas.

It does not positively appear from the record, that

these demurrers were sustained. And it cannot be so taken by intendment; for the record must speak for itself.

It would appear from the record that these demurrers were not sustained; but that the plaintiff made application to all of the pleas; and the record shows that a replication to all the pleas, including the 4th and 8th, was actually filed.

This, if there was a judgment sustaining the demurrers to the 4th and 8th pleas, *was waived by the replication to them;* and no prejudice was done to the defendant, and no error committed to his injury.

SIMRALL, J.:

There was no express remedy given by the law, to redress the wrong done the parent in the seduction of his child. The special action on the case was therefore allowed, in this, as in other instances where a wrong was done, and no "original writ" would be found in the chancery that would suit the circumstances. This form of action, was early accepted—grounded on the idea that the daughter bore the relation of a servant to the parent; the declaration alleging, "*per quod servitum amisit.*"

Judicial history shows, however, that the relation of master and servant, has but little more importance now than as a legal fiction, giving a "technical" right to sue. In substance, the suit is to punish in damages the seducer for the dishonor, disgrace, and mental distress, brought upon the parent. The master may recover for the detachment of the female apprentice or servant, if thereby he has lost her service, or been put to expense. So the master may recover for the beating of his servant, if thereby he has been especially damaged.

But one who stands in the relation of a hirer of a servant, or of a master to an apprentice, sustains gener-

ally no other damages from such injuries than as they interrupt the rendition of the services or involve pecuniary expense.   The relation of the parent to the minor daughter, embraces much more than this.   The parent is bound for the maintenance and education of the child, to train it morally and mentally so as to prepare the woman for the duties and responsibilities of life.   If, therefore, the whole scheme of life as respects the daughter is broken up by a stain of dishonor put upon her, there has been an unlawful interference with the relation between parent and child; such at least is the moral view of it.   The parent is entitled to the love, respect, obedience and services of the minor child. During minority it is subject to the parental control. If there supervenes a change of that condition, it must be distinctly proved.   If the child go out to service, or takes up its abode in the family of another, it is presumed to be with the parent's consent, subject to be revoked.

The ground of the action is purely technical; the older cases required the proof of some sort of service, however small.   That has been receded from, and later authorities say it is enough to establish the " right to claim services."   If the daughter be over 21 years of age she is emancipated from parental authority, and may dispose of her time and her earnings at pleasure. In order that the father in such cases may maintain the suit, the daughter must reside with him and perform some acts of service, though slight.   But if she is under 21, although she does not live with him, and may be actually in the service of a stranger, if, *de jure*, he may control her services, he may sue.   Savage, C. J., Clark v. Fitch, 2 Wend. 461.   In that case, the father gave to his daughter her time absolutely, and had told her she must support herself.   When the seduction occurred and the child was born, the daughter was in the family of her employer.   The accouchee's fee had

been actually paid by another person, who said he looked to the father for reimbursement. The last circumstance was all that there was in the case that indicated any loss to the parent. That, however, had not been sustained. The judgment rested upon the reason that the paternal control had not been relinquished; that the license given the daughter could at any time have been revoked; that in case of sickness or infirmity, incapacitating her to support herself, the father would have been obliged to maintain her.

Judge Reeve, in his Domestic Relations, 292, very aptly suggests, " that when the daughter is bound out to service, a rigid adherence to the idea that the loss of service is the ground of the action, would prevent the father's recovery, but if we consider this action as really having its foundation in another principle, viz.: the disgrace of the family, it would be no objection to the maintenance of the action, although the daughter should live as an apprentice to a master." In Hewitt v. Prime, 21 Wend., Nelson, C. J., remarked that it " was apparent from a perusal of modern cases, and elementary writers in England, that the " old idea of a loss of service " has gradually given way to a more enlightened and refined view of the domestic relations. In this case a charge to the jury was sustained—" that no loss, expense or damage prior to the suit brought need be shown; it was enough to prove the seduction." The suit was begun some months before the child was born. In Martin v. Page, 9 Johns. 387, the daughter, at the time of her seduction, resided in the family of her uncle, and worked for him when she pleased, for which he agreed to pay her, but there was no agreement for her continuance with him for any definite time, nor did she have any expectation of returning to her father. On these facts, Spencer, C. J., held, that the father had made no contract for hiring out his daughter, and that although she had no intention of returning, that did not

terminate the relation ( of parental right to her services,) because her volition could not terminate his right.   The learned judge further remarked, upon the case of Dean v. Peel, 5 East. 49, that it was the only one in which the right of the father to maintain the action, the daughter being under age, had been denied.   The case being distinguishable from that when the daughter was over age and in the service of another, as in 3 Burr, 1878.   There was this other peculiar feature—the daughter was under an indenture of apprenticeship at the time of the seduction—therefore, it was urged that the master alone could maintain the action.   The response to that was, that the form of the action being ease, the gist of it was the consequential damages, and how the seduction being such misconduct as would entitle the master to put an end to the apprenticeship, and the daughter having actually returned to her *mother*, the suit was brought within the requirement of the technical rule.

The judge supposes the case of the defilement of an apprentice or hired servant by the master, and puts the query, has the parent no redress?   " The supposition is not to be endured."   In Hornketh v. Barr, 8 Serg. & Raule, 36, the objection was, that the daughter for many years had resided in Philadelphia, sometimes with her sister and sometimes out at service, so that the learned judge replied that he considered " the action was substantially brought by the father for the debauching of his minor daughter, and it is not necessary the child should actually live with the father, if she resides elsewhere, with or not against his consent."   Recurring to the English cases, decided by the most eminent judges, we will find the same judicial inclination.

In Forbes v. Wilson, Peake's *Nisi Prius* Cases, Lord Kenyon, whilst holding that there must be some relation of master and servant, said that a very slight relation was necessary, and that it had been determined,

that " where daughters of opulent families had been seduced, the parent may maintain the action on the supposed relation of master and servant." In those cases where the daughter has attained majority—as in Bennet v. Alcott, 2 T. R. 166 (she was thirty years old,) the smallest service was sufficient, such as occasionally milking the cows. In Dean v. Wynkoop, 18 N. Y. 45, the indenture of apprenticeship was set up in bar of the action. But proof that the defendant procured the apprenticeship, to give him the opportunity of seduction, was an answer to the defense. In Mulxhall v. Millward, 11 N. Y. 343, the test of the parent's right to the action is put upon the ground of " his right to the daughter's services," irrespective of whether she is living in his family, or in service for wages.

The form of action may be sometimes trespass, alleging the breaking and entering the plaintiff's close, as the " technical right," the seduction being in aggravation. If the trespass can be justified, the damages for the seduction would fall with it. A notable instance of the evasion of the technical rule is furnished by Hubbell v. Wheeler, 2 Atk. (Vt.) 359, the action was trespass *quare clausum fregit,* the seduction being laid as among *alia enormia.* The defendant being a boarder in the family, justified his right to enter the house. The plaintiff, however, was permitted to recover on the idea that he might novel assign the debauchment of his daughter, and recover for that as a distinct tresspass. The later cases in New York, such as Bartley v. Richmeyer, 4 Comst. 38, reversing the same case in 2 Barb.; Dean v. Wyncoff, 3 Seld. 191, and Mulnhall v. Millward, 1 Kern. 343, dissent more or less from the earlier cases, and evince a disposition to return to the old rule, in that they have not been followed by the American courts generally. In Indiana, in Botton v. Miller, 6 Ind. 265, the court

treats it as the settled American doctrine, "That the relation of master and servant exists constructively between the father and infant child, although she is actually in the service of another, provided the father has a right at any time to reclaim her services." In the previous case of Boyd v. Boyd, 8 Black, 113, the father had given his daughter her time, and she had left his house a year previous, without intention of returning, and was residing with the seducer at the time, etc., yet the father maintained the action. In Botton v. Miller, the daughter, at the time of seduction was residing with a master, under defective articles of apprenticeship. The court held, however, that it was of no greater force than a license to appropriate her time and wages to her own use; which he could at pleasure recall. In Virginia, in Lee v. Hodges, 13 Gratt. 728, it is conceded that, as respects a minor daughter, the old English rule, " as respects the facts and circumstances necessary to prove the relation of master and servant, and the loss of service, vary in some important particulars from those which have prevailed in England."

In Kentrick v. McBeany, 11 Ga. 604, the daughter was over twenty-one, and the objection was that the plaintiff (the father) must prove a contract of service. *Held*, not necessary to prove such a contract, so long as minority exists; the law gives dominion over the child, after majority; if she resides in his family, the contract is presumed if she is in situation to render services. And this presumption is indulged for the most benevolent purposes; "to preserve his domestic peace, by guarding the purity and innocence of his child." In Roberts v. Connelly, 14 Ala. 239, the right to maintain the suit is put upon the authority of the parent to control and command the services, "and it is not necessary to prove actual services rendered, or that the seduction took place whilst the daughter was residing at her father's." In the well-reasoned case of Parker v. Meek, 3 Sneed

(Tenn.) 31, the seduction occurred during the lifetime or the father; but after his death, the daughter remained with the mother, and gave birth to a child; it was held that the mother could recover. If the form of the action had been trespass, stating the unlawful breaking and entering the close, as the technical gist of the complaint, and laying the seduction as consequential damages, it is manifest the mother could not have succeeded; because at that time the father was living, and the trespass would have been upon him. But in case the gist of the action is not the illegal entry upon the premises, but the consequential damages that ensue from the injury to the daughter. In this view, it does not matter whether the daughter be an inmate of the mother's family, or not, when the wrong is commited upon her.

We have gone far enough into the subject to show quite clearly that the "*per quod servitum amisit*" feature of the action has not been permitted to stand in the way of the recovery of damages for the substantial injury. If an indenture of apprenticeship be in the way, the misconduct of the apprentice has been held to be a cause of dissolution, and if the daughter quits the master, the dissolution will be made to relate back, if necessary, to the date of the wrongful act. If the debauchment occur in a distant state or town, as where the daughter is at school, or in employment for wages, on the declaration of the father, that she must shift for herself, or support herself, yet he is *de jure* entitled to her services, earnings and society, and so may maintain the action. If, at the time of the defilement, she resided elsewhere, and so continued at the birth of the child, and the father had lost no services, and was only bound for the accoucher's fee which a friend had paid, it has been held he can recover. If she be defiled by a master to whom she is apprenticed, or in whose employment she may be, although she receive and appropriate her wages, the courts, in several instances, putting the supposititious

case, have decided it would be monstrous to refuse the action.

A perusal of the books shows how difficult it is for the judicial mind to emancipate itself from forms sanctioned by age and long experience. But courts can not stand still, and observe society in the march of improvement towards higher development of morals, and a more refined appreciation of its varied relations. Jurisprudence must expand its principles, and their applications, so as to keep in harmony with the necessities of advancing society. The idea that this action rests upon the relation of master and servant, originated in a ruder civilization than ours. The true relation of parent and child, is that of protection, nurture and education, on the one side, and dependence, filial affection and obedience on the other. The ties of nature are generally sufficient to enforce these duties. Control over the child, so as to dispose of its time, and labor, and person, is necessary in order that the parent may so train and guide his offspring, as that it may be a virtuous and (according to circumstances) a useful and intelligent member of society. The family is the oldest institution among men; out of the aggregation of these lesser communities, the state and the nation is made up; whatever tarnishes the purity and honor of the female members, whilst entailing disgrace and suffering upon the family, also in its effects is a public wrong.

That system of jurisprudence which punishes in damages the slightest aggression upon property, but denies redress to the father, and if he be dead, to the mother, for the defilement of an infant daughter (except upon the predicate of a loss of services), is at variance with the sentiments and conscience of this age.

So clamorously has the injury inflicted upon the parental feeling, and the disgrace attaching to the

female, and reflected from her upon the family, pressed upon the judicial mind, as the substantial injury to be redressed, that the courts have, in case after case, so frittered away the technical *gravamen* of the action, that but little more now remains except the barren form.     The remark of an eminent judge is true, " that this relation of master and servant is but a figment of the law to open the door for the redress of the real injury;"  " the parent comes into court as a master, he goes before the jury as a father."

In the best considered cases, those at least that receive our assent, this is the principle:   For the seduction and defilement of a minor daughter, the parent may recover for the wrong, because it is his right and duty to protect the person and the morals of his child, and so long as disability of non-age continues, he has, *de jure*, the authority to control its person and conduct, its society and services; that the abnegation of this authority and right is not to be presumed, unless there has been some decisive act done, or contract made, by which the parent, in such form as is obligatory, absolves the child from dependence upon him, and places her under the control and disposition of another; and while this condition of things continues, he may maintain the action, although the injury be done whilst the infant was an apprentice.     If that relation be dissolved, and the parental rights are resumed, the suit may rest upon any consequential damages the parent may have sustained.

If the daughter be defiled by the person in whose family she resides as a member, or to whom she may be hired for wages, such person will be amenable in damages, on the idea of being a *tort feasor,* from the perpetration of the injury, or because the wrong-doer shall not be permitted to plead that which was intended to be for the good of the child, as a justification for her ruin.     In the case of a minor daughter, it is not neces-

sary to prove a loss of service, or expense incurred. The father, or mother (if he be dead), may stand upon the "parental right to command them." The value of the society or services of a daughter consists very much in the innocence and purity of her person and character, and are greatly depreciated in consequence of her defilement, which not unfrequently occasions their total loss. Judge Reeve, in his text, lays it down, if the father be dead, the mother may bring the action. Domestic Relation, margin 292. In Sergeant v. ——, 5 Cow., the suit was by the mother. So in 3 Sneed, *supra;* 5 Ohio 317. In this case the daughter was not in the employment of the defendant under a contract for services. The mother had not abandoned her parental authority. The confinement and birth of the infant took place at the mother's house. So there is no difficulty in bringing the case within the rule approved by the best considered authorities.

Justice has been done by the jury, on the facts in evidence, and we think it unnecessary to examine each specific point made for a reversal of judgment.

*Judgment affirmed.*