RUTH WEAR MILLER *v.* JOHN L. MILLER.

FLORA M. MILLER *v.* RUTH WEAR MILLER.
[Nos. 31, 32, October Term, 1933.]

426

*Decided Decmber 7th, 1933.*

. The causes were argued before Bond, C. J., Pattison, Urner, Adkins, Digges, and Park, JJ.

*Albert A. Doub* and *George Cochran Doub,* with whom were *Parker, Carey & Doub* on the brief, for Ruth Wear Miller.

*Edward J. Ryan* and *Walter C. Capper,* for John L. Miller and Flora M. Miller.

Digges, J., delivered the opinion of the Court.

Ruth Wear Miller, wife of Walter L. Miller, plaintiff, on October 22nd, 1932, filed suit in the Circuit Court for Allegany County against John L. Miller and Flora M. Miller, his wife, the parents of Walter L. Miller, defendants, seeking damages for the alienation, from her of the affections of her husband, alleged to have been caused by the defendants. The declaration in substance alleged that the plaintiff first became acquainted with her husband, the son of the defendants, about the year 1917, which acquaintance ripened into mutual love and affection for each other, and as a consequence they were, on June 13th, 1918, married; that her husband took the plaintiff to live with his parents, the defendants, in Ridgely, West Virginia, and resided there for a number of years; that the plaintiff's husband expressed by word and act the greatest

esteem, affection, and love for the plaintiff, which expressions were sincere, and that she enjoyed the complete devotion of her husband; that her husband agreed to provide a home for the plaintiff, and was financially able to do so, but that the defendants discouraged her husband and forbade him to have a home of his own away from them, and stated to the plaintiff and her husband that they would not permit their son to leave them and have a home of his own; that the defendants held and exercised complete influence over their son, and this influence was continuously and maliciously exercised to bring about disagreement and unhappiness between the plaintiff and her husband; that although the plaintiff always treated the defendants with kindness and consideration, the defendants wickedly and maliciously conspired to break up the marriage of the plaintiff and their son, and to alienate the affections of plaintiff's husband from her; that they constantly complained of the plaintiff to her husband and found fault with her; that they resented the presence of the plaintiff in their house and told her that she had no business living in their house, but that they would not permit their son to leave them. That the harsh and brutal treatment of the plaintiff by the defendants became so unendurable that the plaintiff was obliged to take rooms on Decatur Street in the City of Cumberland, where she saw her husband frequently and constantly received affectionate letters from him; that her husband continued to be attentive and affectionate, frequently visited her and expressed regret at what had occurred, but stated that his parents would not permit him to live with her as he wished to do; that in the fall of 1931 the defendants finally accomplished their purpose of alienating the affections of her husband, and he ceased coming to see her and ceased writing to her shortly after the defendants had told her husband that he would be disinherited from their large estate if he had anything further to do with the plaintiff; that continuously over a number of years up to the present time the defendants maliciously and wickedly conspired against the plaintiff by using their influence over the son to bring about, and did bring about, the loss of affection

of the plaintiff's husband towards her, and that without any just or proper cause the defendants, maliciously and from hatred and ill will toward the plaintiff, alienated the affections of her husband, and deprived the plaintiff of the society, comfort, affection, and support of her husband, to her great loss and damage; that as a consequence of said alienation of her husband's affections and her abandonment by him, she is destitute of any means of support except what she may herself earn, and has sustained great humiliation and mental agony.

To this declaration the defendants filed three pleas: First, that they did not commit the wrongs alleged; second, that the alleged cause of action did not accrue within three years before this suit; and, third, that this court ought not to take cognizance of the offense in the aforegoing declaration specified, because, while protesting that they did not commit the wrongs alleged, and are not guilty of the same, nevertheless any action which the plaintiff has for any wrongs alleged to be done by the defendants should be brought in the State of West Virginia where the defendants reside and where occurred any of the claims which the plaintiff alleges she has against these defendants. The plaintiff joined issue on the first and second pleas and demurred to the third plea. The record does not disclose the ruling of the court on the demurrer to the plea to the jurisdiction, and we assume this plea was abandoned. It could not properly be considered, for several reasons: First, because, being a plea in abatement or dilatory plea, it cannot be joined with the general issue plea or plea to the merits; and, second, because it was not verified by affidavit. 1 *Poe's Pl. & Pr.*, sec. 600; *Chapman v. Davis*, 4 Gill, 176; *Cruzen v. McKaig*, 57 Md. 459; *Spencer v. Patten*, 84 Md. 421, 35 A. 1097; *Waggaman v. Nutt*, 88 Md. 275, 41 A. 154; *Sheppard v. Graves*, 14 How. 505, 14 L. Ed. 518; *Balto. & O. R. Co. v. Harris*, 12 Wall. 65, 20 L. Ed. 354; *Glenn v. Williams*, 60 Md. 93; *Carroll v. Bowen*, 113 Md. 154, 77 A. 128; Code, art. 75, sec. 28, subsec. 84.

The plea of limitations was made the subject of the defendants' eighth prayer, which is: "The defendants by their counsel pray the court to instruct the jury that even if they believe from the evidence that the defendants by their conduct alienated the affections of Walter L. Miller from the plaintiff, and that said alienation resulted in the loss of consortium between the plaintiff and her said husband for more than three years before the bringing of this suit, then the plaintiff is not entitled to recover in this case, and the verdict of the jury shall be for the defendants." This prayer was specially excepted to on the ground that there was no evidence in the case to support it. The special exception was sustained and the prayer rejected. There was no error in this ruling, because the loss of consortium occurred, if at all, within three years before the institution of the suit; there being no evidence whatever that it occurred prior to that time. The gist of this action is the loss of society, affection, assistance, and conjugal fellowship or consortium of the husband. The first instant of time at which the plaintiff could institute an action of this kind would be immediately after the society, affection, and conjugal fellowship, usually combined and expressed by the term "consortium," is lost. The limitation runs from such time, and has no reference to the words or acts alleged to have been the cause of such loss. *Annarina v. Boland*, 136 Md. 365, at page 379, 111 A. 84; 30 *C. J.* 1128; 37 *C. J.* 898; 13 *R. C. L.* 1463, sec. 511; *Bockman v. Ritter*, 21 Ind. App. 250, 52 N. E. 100.

The case was submitted to the jury, and at the close of the whole evidence the court granted a prayer directing a verdict in favor of the defendant John L. Miller, and refused a similar prayer for a directed verdict in favor of the defendant Flora M. Miller. The verdict and judgment was against the defendant Flora M. Miller. This action resulted in the two appeals which are contained in this record. In No. 31 the appellant is the plantiff below, and her contention is that the lower court erred in directing a verdict for the defendant John L. Miller, and that there was no error in refusing the prayer directing a verdict in favor of the defendant Flora

M. Miller. The contention of the appellant in No. 32, Flora M. Miller, is the reverse, she contending that the prayer instructing a verdict in her behalf should have been granted.

There are certain undisputed facts contained in the record which we shall briefly state, as they have an important bearing on the question under consideration, and these will be thus stated before examining the controverted facts, which, if sufficient to sustain a verdict for the plaintiff against either or both of the defendants, should have been submitted to the jury for its determination and solution. The undisputed facts are that the plaintiff, a native of Pennsylvania, came to Cumberland, Maryland, in 1914, and entered Western Maryland Hospital to pursue studies and receive instruction which would qualify her as a graduate trained nurse; that she completed the training in 1917, shortly after which she became acquainted with her husband, Walter L. Miller, the only son of the defendants, they having one other child, a daughter; that this relationship ripened into mutual love and affection and culminated in their marriage on June 13th, 1918; that this marriage took place in Pennsylvania, at the home of the plaintiff's parents, and was not made known to the defendants until their return to Cumberland; that the husband, Walter L. Miller, entered the army in July, 1918, and remained there until December of that year, at which time he was discharged and returned to Cumberland; that during the time he was in the army, the plaintiff practiced her profession, and resided, when not thus engaged, with her uncle and aunt in Cumberland; that upon his return he resided with his parents, the defendants, in West Virginia, while the plaintiff continued to reside with her uncle until August, 1919, although during the period from the husband's return from the army to the time of the married couple taking up their residence with the husband's parents, they saw each other daily, and from time to time lived together as man and wife; that from the summer of 1919 the couple lived with the husband's parents in West Virginia for the period of seven years, or until some time in the year 1926, at which time the plaintiff left the home of her husband's parents and lived in

Cumberland with her younger sister, who was also a trained nurse, boarding with a Mrs. Cunningham in that town; that during the whole seven years she resided with her husband's parents she was occupied in their home in assisting with the household duties and helping her father-in-law to do the milking and some other chores around the place, with the exception of the periods when she would be called upon to do professional work in Cumberland, which professional duties occurred from time to time and necessitated her being away from the defendants' home; that after she left the defendants' home in 1926, and during the whole time of her living with them, she retained the love and affection of her husband, until the month of October, 1931, which was five years after she had ceased to reside with her husband's parents; that during this five-year period the husband saw her daily and nearly every night, and cohabitation continued between them until October, 1931; that at the time the testimony was taken in this case the plaintiff was forty years of age and her husband thirty-nine; that shortly after the plaintiff left the domicile of her husband's parents, the husband also left and engaged in operating a garage in the City of Cumberland, maintaining sleeping quarters over the garage, and did not spend more than a few nights with his parents during the five-year period mentioned.

That on July 11th, 1932, the plaintiff filed her bill in equity in the Circuit Court for Allegany County, praying for alimony *pendente lite* and permanent, and counsel fees. In this bill, which was sworn to by her, it is alleged that her husband treated her with such harsh cruelty and brutality that in August, 1926, his conduct became so intolerable that she was obliged to leave his home and go live with her sister in the City of Cumberland; that since the said abandonment by the husband she had frequently offered to return to him and reside with him if he would provide her with a home such as he was financially able to do, and treat her properly, but that her husband refused and failed to do so, and declared his intention to live with her no longer; that such abandonment had continued uninterruptedly for more than

three years prior to the institution of the divorce action, and was deliberate and final and beyond any reasonable hope or expectation of reconciliation. A further allegation of the bill is that her husband has committed the crime of adultery with at least one party whose name will be produced at the hearing; and that she had not lived or cohabited with her husband since she discovered his said adultery. This bill for divorce was subsequently amended, the amended bill being sworn to on September 15th, 1932. In the amended bill she retracted the allegation in the original bill as to the period of separation, and therein alleged that she had been treated with harshness and cruelty by her husband; that her husband's father and mother disliked her, without just cause, and abused and ill-treated her in all manner of ways; that her husband was completely subject to the influence of his parents, and made no effort to shield her from their abuse and ill-treatment and protect her from the continuous humiliation she was subjected to by his parents; that in August, 1926, his parents, without just cause or reason, forced her to leave their home, and she was obliged to live with her sister in the City of Cumberland and support herself by the practice of her profession; that, after leaving, her husband frequently came to see her and expressed regret at what had occurred, and said that his parents would not permit him to live with her as he wished to do, but professed love and affection for her and persuaded her to continue conjugal relations with him; that in October, 1931, her husband, without just cause or reason, declared his intention to abandon her, stating that his parents had threatened to disinherit him of his share of their large estate if he had anything further to do with her. She also reiterated her charge of her husband's adultery, and that she had not cohabited or lived with him since she discovered said adultery. The relief asked for was the same as in the original bill.

The record does not show that any disposition was made of the divorce proceedings up to the filing of the declaration in the present case claiming damages from her husband's father and mother for the alienation of his affections.

The law is settled in this state that a married woman is entitled in her own name and right to sue a third party for the alienation of her husband's affection. *Wolf v. Frank,* 92 Md. 138, 48 A. 132; *Callis v. Merrieweather,* 98 Md. 361, 57 A. 201; *Francis v. Outlaw,* 127 Md. 315, 96 A. 517, 518; *Annarina v. Boland,* 136 Md. 365, 111 A. 84. And this is true even though the defendants in such action are the husband's parents. *Francis v. Outlaw, supra.* The authorities properly make a distinction, however, between cases where the defendants are strangers and those where the defendants are parents or guardians. In the latter class of cases, in order to require the parents or guardians to respond in damages, in addition to the proof of alienation it must be shown that the acts causing the alienation were done with the wilful and malicious intent to injure the plaintiff, and not out of a reasonable parental concern and solicitude for the child. The reason for this rule in respect to suits against parents and guardians is nowhere better stated than in the early case of *Hutcheson v. Peck,* 5 Johns. (N. Y.) 196, which has been quoted and applied in many subsequent decisions, wherein Chancellor Kent said: "A father's house is always open to his children; and whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and according to Lord Coke, it is 'nature's profession to assist, maintain and console the child.' I should require, therefore, more proof to sustain the action against the father, than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband, from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed." *Oakman v. Belden,* 94 Me. 280, 47 A. 553; *Bennett v. Smith,* 21 Barb. (N. Y.) 439; *Westlake v. Westlake,* 34 Ohio St. 621; *Francis v. Outlaw, supra,* and

cases therein cited. In the last-cited case this court, speaking through Judge Pattison, said: "But if there is evidence upon which the jury would have a right to find that the defendant has actively interfered to cause his daughter to abandon her husband, and has deprived him of her affections and of the comfort and solace of her society, and has done this from malice to the plaintiff and not for the purpose of affording proper protection to his child and furthering her true welfare, then the case must be left to the jury, with the instruction that if these facts are proved the action may be maintained. *Holtz v. Dick,* 42 Ohio St. 23; *Price v. Price,* 91 Iowa, 693, 60 N. W. 202; *Tucker v. Tucker,* 74 Miss. 93, 19 So. 955; *Bennett v. Smith, supra; Williams v. Williams,* 20 Colo. 51, 37 P. 614; *Railsback v. Railsback,* 12 Ind. App. 659, 40 N. E. 276, 1119."

The lower court's instructions, granted at the instance of the defendants, recognized the distinction between parent defendants and strangers, and in this aspect presented the case to the jury in as favorable a manner as the defendants could require. The solution of the question now before us, therefore, depends upon the question of whether or not, applying the rule in respect to parent defendants, the trial court erred either in directing a verdict for the defendant John L. Miller, the father, or refusing to so direct in favor of the defendant Flora M. Miller, the mother.

First, in respect to the directed verdict in favor of the defendant John L. Miller. In reviewing the record to reach a decision on this question, we are bound to assume the truth of all the evidence properly given to the jury to sustain the plaintiff's right to recover, as well as all inferences of fact fairly deducible therefrom. *Leopard v. C. & O. Canal Co.,* 1 Gill, 229; *Hiss v. Weik,* 78 Md. 445, 28 A. 400; *Francis v. Outlaw, supra;* and other cases in this court too numerous to be here cited. The evidence upon which reliance must be placed to hold John L. Miller, the father, liable, is contained almost entirely in the testimony of the plaintiff. She testified: "After Walter took me to the Miller home to live my presence was resented from the very beginning in their home.

I lived with them seven years. During that period they were not kind; neither Mr. or Mrs. Miller. They were never affectionate. In the presence of Walter Miller, Mrs. Miller told me in her own home that that was not my place. That if I were not there that their daughter would come. That I was taking her place and it was not my place, not my home. She said that many times on different occasions. Walter heard that. John Miller said very much the same things. He said the same things in Walter's presence. Walter's mother stated that that was not my home, not my place, in staying there, and that I would never live with Walter Miller. She said that was Walter's home and not mine. Mrs. Miller told me, 'You may as well leave for you will never enjoy any of our money. It is being left to Margaret Miller, Walter's sister, and dealt out to Walter as she sees fit and you will never enjoy a penny of our money.' I think Mr. Miller was present when that was said. She said that several times to me. She had just previously told me that Walter and Margaret were to inherit $150,000 apiece and that is when she said, 'You will never enjoy any of it.' The defendants permitted Walter to use their automobile only on condition that my husband never took me along. They gave him money on condition that he didn't give me any. I was never permitted to have visitors in the house. I was not permitted to use the telephone in the Miller household. I was not taken on any trips in their automobile by the defendants to my knowledge. Different times they would take Walter and I had to stay at home. On different occasions Mrs. Miller told me, she said that I was not good enough for Walter. Walter heard that. I never bought any furniture, but little things like linens and bedding and draperies I bought with the intention of going to housekeeping a little later. I always looked forward to it. I always wanted to go to housekeeping. Toward the last, when I showed them to Mrs. Miller she looked at them and said, 'You will never use them with Walter Miller.' I think Walter was present and heard that. John L. Miller was present. When we were alone Walter was like a different person entirely. Around his parents it

was a fear, a continuous fear all the time when around his parents, but when alone he was just a different person. He displayed very much affection ·for me but not before his parents; never before his parents. Mrs. Miller told me on different occasions that if I didn't get a divorce they were going to send, both Mr. and Mrs. Miller, were going to send Walter to Canada to stay a certain length of time and then, she said, he may receive his divorce. I told her that we both loved one another and that there was no reason for us to have a divorce. Mrs. Miller replied, 'Well, you will never get along together if I have anything to do with it.' Walter heard that and Mr. Miller heard it. He was there. I complained to Mrs. Miller and Mr. John Miller that Mrs. John Miller didn't want me there, and I wanted to know if Walter and I couldn't get a few rooms and go somewhere else to live. John Miller replied that we could not go. I don't think he gave any particular reason any more than they didn't want him to go with me. Mr. John Miller said several times that Walter Miller was too nice a boy to live in a couple of rooms." That on one occasion at Christmas time "Mr. Miller took Walter and Margaret in another room and gave them a Christmas gift and forbade them to give me anything. I heard John Miller say to Walter not to give me anything. The Christmas presents were $10.00 to each. I recall an occasion when Mrs. Miller took Walter into the bathroom and talked to him. I overheard the conversation. She took Walter into the bathroom and I overheard them both talking and she told him—we were speaking about going to housekeeping—that he never could live with me and he never could have any children, and if he did—I don't know whether she thought he was going to or not—I think that was the reason that she told him this—if he did, to try and get rid of it in some way.

"Q. Did you ever overhear a conversation between Mrs. Miller and your husband when she said something about separate rooms for you and Walter? A. Yes—well, that was no conversation. That was told right to us, that Walter would have to go into another room to sleep. Walter was

present. One morning we came downstairs and Mrs. Miller told me that Walter could no longer stay in there with me, that she was going to fix up one of the other bed rooms for Walter to go in to be away from me. Shortly after that I came to town and for a short time I was at my uncle's home."

Plaintiff further testified that after she left the Miller home, "I had further conversations with Mr. Miller, Senior, several times down at the Miller garage and several times on the street. I never saw Mrs. Miller on the street. Never passed the time of day. I saw Mr. Miller at Walter Miller's garage on Bedford Street. I couldn't tell you the exact date, but I met him there on several occasions. It was in the day time. I often went down to the garage to see Walter. I recall a conversation I had with Mr. Miller in the office in the back part of the garage. I spoke about going to housekeeping, but he didn't make any effort to tell us what to do. That is the only time I had a conversation with Mr. Miller about housekeeping. That is all that was said. The other conversations took place in the Miller home in Ridgely. Q. Do you recall any statements that Mr. John Miller made to you in the presence of Walter Miller about you and Walter living together or not living together? A. No, he was not in favor of it. They were not in favor of our living together. Q. What did he say? A. Told Walter they would disinherit him if he ever left their home and went to live with me. Those remarks were made by both Mr. Miller and Mrs. Miller. Q. Did you hear them say that? A. Yes; they both told Walter at different times. Q. They both said that. A. Yes. Q. At different times? A. Yes; different times."

The witness Mrs. Ethel Barb testified that at the Walter Miller garage, some time in the year 1929 or 1930, the defendant Flora Miller said to witness: "Walter shall not leave my home and go to live with Ruth. No, siree, not while I am living." Witness further stated that at the time of this conversation the plaintiff and her husband, Walter, were kind and affectionate and loving towards each other.

The plaintiff further testified that on one occasion, while returning from the barn to the house with milk, she spilled

some of it, and the defendant John Miller at that time swore at her. Upon being recalled, the plaintiff stated, in respect to the conversation which she had with John L. Miller at the garage, that: "Mr. Miller looked at me and said, 'Well, you can go to housekeeping.' Mrs. Miller wasn't there at the time." On cross-examination the plaintiff said that Mr. Miller did not give any reason for that statement.

We are of the opinion that the above-recited testimony is not sufficient to submit to the jury as forming the basis of a verdict against the defendant John L. Miller. Admitting all of it to be true, it cannot form the basis of a rational conclusion that it alienated the affections of the plaintiff's husband; and it fails entirely to be sufficient to show that it was done wilfully and with malicious intent to alienate the affections of his son or bring about a separation between him and the plaintiff. This couple lived with the husband's parents for seven years, during which time it is conceivable that the father-in-law did not like the plaintiff, and did not desire her to remain in his home. Such an attitude he had a right to assume without incurring the legal liability to his daughter-in-law which might follow upon sufficient proof of the actual alienation of his son's affections. He was not bound to receive or keep the plaintiff in his home, even though her husband was unable to maintain a separate home for her, although it is shown that he did permit her to remain there for seven years, and then she only left because of her voluntary determination to do so. In our opinion it cannot be held that John L. Miller was responsible for her leaving his home, or that the leaving of that home by the plaintiff resulted in the alienation of the son's affection. According to the allegations of the plaintiff's *narr.*, as well as her own testimony, she retained the love, affection, and consortium of her husband for at least five years after she had ceased to live at the defendant John L. Miller's home. In addition, this is shown to be true by the letter produced in evidence by the plaintiff, from the husband to her, dated January 31st, 1931, which contains expressions of love, affection, and endearment, and unmistakably indicates that it was

written for the purpose of seeking forgiveness at the hands of his wife for some real or fancied dereliction on his part. By uncontradicted evidence, as shown by the original bill for divorce filed by the plaintiff against her husband on June 11th, 1932, less than six months from the date of the last-mentioned letter, the plaintiff was charging her husband with cruelty and brutality, and further charging that he was guilty of adulterous intercourse with other women; and also charging abandonment uninterruptedly for the period of at least three years before the filing of that bill. It is further shown by the records produced by the plaintiff, in the form of her amended bill, that after she discovered that the allegation of abandonment for three years was untrue, the fact being that she had cohabited with her husband upon various occasions, all less than a year before the filing of the original bill for divorce, she then for the first time alleged cruelty on the part of her father-in-law, John L. Miller, and such treatment by him as made it necessary for her to leave his home, and yet at the same time continues and reiterates the allegation that her husband was guilty of adultery, averring that by reason of such allegations she would be entitled to a divorce *a vinculo matrimonii,* and reserving the right to apply for such a decree in the future, only asking for alimony at that time.

Suits of this nature, seeking damages for the alienation of the affections of one spouse, are the proper subject of substantial damages when the proof is sufficient to warrant a verdict. But it is to be borne in mind that such suits, especially those against the parents, can be, and often are, made the instruments of extortion; and courts should be vigilant in requiring that the proof show with reasonable certainty that the affections were in fact alienated by the acts complained of, and further, in cases where the suits are against parents, that such acts were actuated by malice and willful intent to injure the plaintiff. It is hardly possible that a husband and wife could make their home with the husband's parents for the period of seven years without some dissension or conflict between the daughter-in-law and the parents; and after the

daughter-in-law leaving the home voluntarily, and allowing a period of five years to elapse before bringing suit against the parents, during which time other causes, as in this case, did intervene to disrupt the marital relations, to allow recovery in such a case, except upon the clearest and most positive proof, would be stretching this form of action beyond its legitimate purpose.

The plaintiff contends that because at common law the husband was liable during coverture for all the torts of his wife, whether committed by her within or without his presence, and with or without his participation or sanction, the husband in the present case is equally responsible for all of the acts and words of his wife done or uttered in his presence; and as authority for this contention it is pointed out that Code, art. 45, sec. 5, provides that the husband should be relieved of responsibility for the torts of his wife when "committed separately by her out of his presence, without his participation or sanction." If it be true that, under the present state of the law, which we do not here decide, a husband is responsible for all torts committed by his wife in his presence, we do not think that in a case for alienation of affections every word and act of the wife, constituting a chain of words and acts which may result in a verdict against her, can be chargeable to the husband, where it is shown that he may have been present at the doing of some of the acts, or within hearing of some of the words spoken. We have been referred to no case at common law or since the passage of the statute wherein the husband has been held responsible, in cases of alienation of affection, for the acts and words of the wife, solely because of his presence; but, on the contrary, there are numerous cases where the suit has been against both parents, and a verdict has been rendered against one and not the other.

What we have said in respect to the principles in such a case as here applied to the father, John L. Miller, is likewise true in respect to the mother, Flora M. Miller. But the record discloses many acts of the mother which do not include the father. In other words, there is testimony which tends to show a continued determination on the mother's

part to humiliate and belittle the plaintiff in the estimation of her husband. While no one act, or what transpired on a single occasion, might be sufficient, a long-continued practice of this description might have that effect, and would indicate a wilful determination on the part of the mother to disrupt her son's marital relations and bring about a separation. The case in respect to the mother is a border-line case, and we are unwilling to say that as a matter of law there was no sufficient evidence to permit the case to go to the jury with respect to the defendant Flora M. Miller, and to hold that the lower court was in error in refusing to direct a verdict for Flora M. Miller.

We have examined the exceptions to evidence and find no reversible error in those rulings.

> *Judgment in No. 31 affirmed, with costs to the appellee, including one-half of the cost of the record.*
>
> *Judgment in No. 32 affirmed, with costs to the appellee, including one-half of the cost of the record.*