JOSEPH KURDLE ET AL. *v.* LAVERNE BROOKMEYER
[No. 32, January Term, 1937.]

*Decided April 9th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*John Holt Richardson* and *Charles D. Allman, Jr.*, for the appellants.

*James C. Burch* and *L. Wethered Barroll*, with whom was *W. Albert Menchine* on the brief, for the appellee.

JOHNSON, J., delivered the opinion of the Court.

Laverne Brookmeyer brought suit in the Baltimore City Court against Joseph Kurdle and Nan Kurdle, his wife's parents, to recover damages allegedly sustained by him as a result of the alienation by defendants of the affections of the plaintiff's wife, and, from a judgment obtained by him, the wife's parents prosecute this appeal. During the course of the trial, appellants reserved three exceptions to the rulings of the trial court, the first two of which relate to admissibility of testimony, while the third concerns the prayers.

Much of the testimony is undisputed. Brookmeyer and Mary Kathryn Kurdle, daughter of appellants, became acquainted in 1934. He visited their home frequently, and on May 6th, 1935, they drove to Washington, D. C., obtained a marriage license, and were married by Rev. Allan Poore. At that time Brookmeyer was twenty-one years old, while his wife was eighteen. He testified that the marriage had first been discussed between them a week previously, and that after the ceremony they had lunch with Dr. Felipe Martinez, whose wife was a sister to Mary Kathryn; that it was the plan of himself and his wife to keep their marriage a secret, and they returned to Baltimore and went to their respective homes. However, on the following Wednesday, Brook-

meyer learned that their marriage was known, and he and his wife waited up at the Kurdle home for the return of Mr. and Mrs. Kurdle, in order to tell them of their marriage; that Mrs. Kurdle asked why they had done so, and said she would get the marriage annulled. She sent Mary Kathryn to bed, and Brookmeyer was taken to his home by another of the Kurdle daughters and her friend. Since that date, he testified, he had not seen his wife, but had once talked with her over the telephone; that she then informed him that she was going to have the marriage annulled and refused to talk further with him. He stated that she also told him that a Mr. Clark and Mr. Kurdle (one of the appellants) were going to see him in reference to the annulment; that he later talked with Mr. Kurdle and requested him to leave the marriage as it was, let them live apart, and, if he got a job or was earning a suitable salary to take care of a wife, to let them assume the marital status; that Mr. Kurdle stated that this was a matter which concerned more than one member of the family, and he would have to talk it over with the others; that on Friday evening following he saw Mr. Kurdle and Mr. Clark together, and was then told by Kurdle that Clark would go to Washington with Brookmeyer and they would hire a lawyer to represent him so that he would not have to appear in court.

On the day following the marriage, Mrs. Brookmeyer went to live with her sister in Washington, D. C., and has not since that time lived at the home of her parents. During May, 1935, but after the marriage of the parties, the wife wrote her husband five letters. In the first of these she informed him she had been to see a lawyer in regard to "getting the annulment"; that the lawyer was going to Baltimore to see the husband concerning it, and, if he protested, she would never see him again. In that letter she further stated:

"I bet you think I am a weakling, because I didn't stick with you when I said I would. However, I finally realized that we couldn't possibly get along on what you are making, so I decided that it would be best to call it

'quits' until you were making at least $25 a week." In another letter dated May 15th she wrote, "Please don't call me any more. It might get you in trouble. And I've caused you too much trouble already. Try to forget me, and find another girl that can give you real happiness. I can only mean misery for you. All I can do is wait. I don't suppose you had better write me, as your letters most probably will be intercepted. I'm sorry to hear of your hard luck about the laundry. Now I can see more than ever the hopelessness of two people getting along on your salary."

In the third letter she criticized the husband severely for attempting to have the lawyer who had previously represented him in the annulment proceedings withdraw therefrom. She was still determined to have her marriage annulled, if possible, for she then wrote, "I still have the ring, and will keep it unless you try to make trouble. And if you do try to I'll return it to you and never see you again." The fourth letter is relatively unimportant, while in the fifth she stated she was sorry that things had to turn out in such a way, otherwise she would never have done what she did. While in some of those letters the wife expressed affection for her husband, he testified that he had not seen her since they were written, and the record is devoid of any evidence to show that he made an effort to see her, notwithstanding she was living in Washington, D. C., and far removed from any restraints of her parents' home in Baltimore.

During the later part of May, Brookmeyer's wife, by her next friend, Dr. Felipe Martinez, filed a bill of complaint in the Supreme Court of the District of Columbia against her husband, in which she sought an annulment of their marriage upon the ground of fraud and duress. Shortly thereafter, Brookmeyer filed an answer under oath to the bill of complaint, in which he admitted many of its allegations and failed to deny the others. When this answer was filed, appellee was represented by Harold Ganss, a member of the district bar, who was introduced to Brookmeyer and Mr. Clark, the latter being a friend

of appellants, by Mr. Friedlander, counsel for Brookmeyer's wife in the annulment proceedings. The evidence is also susceptible of a rational inference that Ganss was first employed by Dr. Martinez to represent Brookmeyer. Appellee attempted to testify that Attorney Friedlander, who introduced Ganss to him, was counsel for Mr. and Mrs. Kurdle, but certainly this statement, standing alone and with no facts to support it, can have no probative force. Furthermore, if he did not originally employ Attorney Ganss to represent him, he did by acceptance of his services ratify the act of Dr. Martinez in securing him, and the evidence of Mr. Clark, who seems to have been equally friendly toward appellee and appellants, is that, when the matter of annulment was first mentioned to Brookmeyer, the latter agreed that such a course was, under all circumstances, wise and proper. Again, on May 17th, 1935, shortly before the bill of complaint was filed in the District of Columbia Supreme Court, appellee wrote and mailed the following letter to his wife's father:

"Dear Mr. Kurdle: I am writing you this letter in an effort to retain whatever favorable opinion you had of me previous to the vicissitudes of the last few weeks which I have caused you. In rehearsing the occurrences of the last week or two I can readily see that your opinion will be, and unavoidably too, that I have had absolutely no consideration of your family's feelings, and yours particularly, in the matter which I undertook. But such is not the case. Though the facts of the situation do not accentuate any consideration on my part as regards the feelings of the parents of the girl I love, it has in no small wise overtaxed me considerably in an effort to restrain my own personal feelings regarding the matter, as it was not an effort on my part, as the saying goes "to feather my nest with contributions of loving parents." This is a horrible subject and I had hoped that I could

remain aloof from it but the culmination of opinions seem to indicate that this was my sole desire. Yet those persons cannot be blamed for such opinions, because of such a disparity in our social and financial status. But is it not a continued fallacy of an unthinking person to put himself in the place of the other in trying to render an opinion in the situation. There is no other way in which such degenerate thinkers are able to make deductions. So there, is not their opinion an indication of the way in which they would act under the same situation, or other than the party involved?

"And so it is for various reasons that I have chosen a method of procedure, under the advice of a competent lawyer and friend, which will eradicate any lawful claim on my part, now or in the future, on either your daughter or you. I reiterate that this is a horrible subject but in an effort to exonerate myself from such malicious imputations I have but one choice of procedure in the situation which will absolve me from all claim, now or in the future, and at the same time facilitate the legal procedure of the annulment. The method though, I have much self-respect, is harsh but you need have no regard in that respect (as concerning my personal humiliation) for I desire to have it serve as a recompense for the suffering I have caused you.

"Though your overwhelming magnanimity will balk at such a consideration, I implore you to grant me this one consideration so that I might hold my head on a level with others with self-respect. It will be no more than self-felt humiliation for I am unknown in Washington and will cast no reflections on your daughter whose very utterance I hold most sacred to myself.

"My advice has been that were I to confess

in court that I was under the influence of liquor, or have my appointed lawyer make such a revelation, the presiding judge would grant your request without further ado. I think that this is the most expedient plan involving the least difficulties and with your acquiescence would reduce the time to a minimum Court procedure.

"And, sir, in the future when apprehension has abated itself, and with solemn oath I promise that such will not recur again, and you deem me not unworthy of your daughter's company again, perhaps you will permit me to see her on week-ends. If there were any motive involved such a request would be impertinent, an insult, but when you consider that we love each other and that I have given my promise that it won't recur again, then perhaps you can find reason to respect my word and will permit us to see each other again.

"Owing to the fact that I am still callow in the world of experience, I find it most hard amid the digressions of our previous conversations to state clearly my attitude. So please do not think me altogether a mollycoddle when choosing this method of explanation instead of telling you face to face.

"On closing, I humbly beg your forgiveness for what I have done and do so because my intentions were genuine and sincere and as you have learned before, we had planned to keep our marriage a secret until I was in a position to support your daughter properly. I regret that I must give her up for I love her with all my heart and she loves me likewise and so I shall wait for her until the end of life if it need be.

"With the most highest respect and admiration for you, I remain,

"Very truly yours,

"LaVerne Brookmeyer."

However, Brookmeyer, after having filed the sworn answer to his wife's bill, subsequently filed a substituted answer thereto, the contents of which he likewise swore to, and in the substituted answer he denied the material allegations of the bill. For some reason undisclosed by the record, the annulment suit was, on motion of Mrs. Brookmeyer, dismissed on March 19th, 1936, by the court.

At the time of the trial in the lower court, appellee admitted he had not seen his wife since Wednesday following their marriage, had made no attempt to see her, and did not know where she had been living, and, although he was familiar with the kind of life his wife, who was just out of school, had been accustomed to live, he expected him and her to live on fifteen dollars per week, which was all he was earning. He further testified he was then living in Peoria, Illinois, and was in Maryland merely for the purpose of attending the trial.

The minister who performed the marriage ceremony testified for the plaintiff that Mr. De Kalb Clark visited him shortly after the marriage in company with another gentleman whose name he failed to disclose, but he was unable to state whether Mrs. Brookmeyer accompanied them; that Clark spoke of the embarrassment of the case and asked whether he had returned the marriage certificate, and then, on being informed he had not, asked if he could do anything in regard to withholding the certificate and having the entire thing canceled, and the minister replied there was nothing he could do. He was then asked "Did Mr. Clark mention anything to you about whom he was calling to see you in behalf of?" And the overruling of appellants' objection to this question raises the second exception. The answer was that Clark had told the witness that he was there in the interest of Mrs. Brookmeyer's parents. If Clark was on that occasion there as the agent of appellants, this fact should have been shown in order to permit any statement from him to bind them, and, since there is nothing in the record, apart from his statement, which tends to show he was in fact appellants' agent, the objection should have been

sustained. *Mechem on Agency* (2nd Ed.), pars. 285, 1774, 1775; *Marshall v. Haney,* 4 Md. 498; *Forrester v. State,* 46 Md. 154.

Joseph Kurdle's testimony is to the effect that, after learning of the marriage, he talked with Brookmeyer and asked him why he had been so foolish as to marry his daughter while both were young and Brookmeyer had no income. He then suggested to him that they could not well live together with nothing to live upon and the marriage should be annulled. He states that Brookmeyer agreed to this suggestion, and the letter he later received from him would certainly corroborate his testimony. There is nothing to indicate that this parent had any ill feeling toward Brookmeyer or desired in any way to injure him. He further testified that he did not know the lawyer who represented his daughter in Washington and knew nothing about the annulment proceedings; that he had no idea his daughter was going to Washington or that she was consulting counsel in regard to annulment of the marriage; that on the day following the marriage, when he returned from his office, Mary Kathryn had gone to Washington with her sister. He did not object to her going, but had no idea she was employing counsel until sometime later. On cross-examination he admitted that in November following the marriage Mrs. Kurdle told him she owed fifty dollars, and that Dr. Martinez wanted this sum, since he had made an agreement with an attorney and still owed that amount; that, while he did not know for what purpose his wife was called upon by Dr. Martinez to pay the attorney, he did give her the amount she requested. Mrs. Kurdle, the mother of Mary Kathryn, testified that she did not think Brookmeyer was in position to take care of her daughter; that apart from this she had no objections to the marriage, also that she was willing for her daughter to have the marriage annulled if this was the daughter's desire; that she had done nothing to produce the separation, and so far as she was concerned Mary Kathryn could have seen her husband at any time she desired; that she con-

sented to her daughter going to Washington to be with her sister, and understood the daughter was to have her marriage annulled and did nothing to stop her, because she thought the husband was unable to support her. She also denied having any ill feeling toward Brookmeyer or that she ever had entertained such.

We have reviewed the evidence, because appellants each offered separate demurrer prayers thereto, and each also offered a prayer that there was no evidence in the case "legally sufficient to show that any act of the said defendant, done wilfully and with malicious intent, caused the alienation of the affections of the wife of the plaintiff from her said husband, and their verdict must be for the defendant."

In considering whether either or both of these instructions should have been granted as to one or both appellants, it must be borne in mind that a parent undoubtedly has a right to counsel and advise his or her child so long as such advice and counsel are given in good faith and in the belief on the part of the parent that it is for the child's best interest, and certainly this rule is no less applicable where, as in the present case, the child has not attained her legal majority. 13 *R. C. L.* pp. 1471-1474; 30 *C. J.* sec. 996, pp. 1129-1131; 2 *Cooley on Torts* (4th Ed.), pp. 6 and 7 and note 13 thereto.

The rule was stated by this court in *Francis v. Outlaw*, 127 Md. 315, 317, 96 A. 517, 518, as follows: "It is proper for him (the parent) to give to his daughter such advice and to bring such motives of persuasion or inducement to bear upon her as he fairly and honestly considers to be called for by her best interest; and he is not liable to her husband in damages for her desertion resulting therefrom unless he has been actuated by malice or ill will towards the plaintiff, and not by a proper parental regard for the welfare and happiness of his child. In such an action, the material question is the intent with which the parent acted, rather than the wisdom or even the justice of the course which he took. These questions

have arisen in other jurisdictions; and so far as we have been able to discover they always have been answered in the same way."

Moreover, it is generally held that the gist of the action is the loss of *consortium,* a term defined in *Bouvier, Law Dict.* (Rawle's 3rd Revision) as "the right of the husband and wife respectively to the conjugal fellowship, company, co-operation and aid of the other." In 2 *Cooley on Torts* (4th Ed.), it is said to include "the husband's society, affection and aid," and the late Judge Digges, speaking for the Court in *Miller v. Miller,* 165 Md. 425, 429, 169 A. 426, 427, said: "The gist of this action is the loss of society, affection, assistance, and conjugal fellowship or *consortium.*" See, also 30 *C. J.* sec. 997, p. 1123; *Wallace v. Wallace,* 85 Mont. 492, 279 P. 374, 66 *A. L. R.* 587, and annotations; *Worth v. Worth,* 48 Wyo. 441, 49 P. (2nd) 649, 103 *A. L. R.* 107, and annotations; *Wolf v. Frank,* 92 Md. 138, 48 A. 132; *Callis v. Merrieweather,* 98 Md. 361, 57 A. 201; *Francis v. Outlaw,* 127 Md. 315, 96 A. 517; *Miller v. Miller,* 165 Md. 425, 169 A. 426.

From the facts found in the record, it becomes apparent that appellee has failed to prove any loss of his wife's affections, one of the chief elements in actions of this character, because her letters to him justify the statement that when he last communicated with her he had not lost such affections. But we feel that, upon broader principles, the two instructions, which were in effect demurrers to the evidence, should have been granted on behalf of each appellant, for the reason that the evidence fails directly or by legitimate inference to show against either of them a state of facts which would establish liability to appellee for the loss of *consortium.* The evidence, when viewed in the light most favorable to appellee, tends only to show that both appellants, from honest and sincere motives, prompted by a parental consideration of what they conceived to be their daughter's welfare, advised and counseled her in good faith, and, as has been previously shown, such acts do not establish liability upon their part.

It is proper to add that the admission of testimony embraced within the first exception was erroneous, but this of itself was not sufficiently injurious to require a reversal of the judgment appealed from.

In view of our conclusion that the demurrer prayers offered by each appellant should have been granted, it becomes unnecessary to discuss the remaining prayers offered by appellants or those offered by appellee.

*Judgment reversed without a new trial, with costs to appellants.*