### ALBERT TUCKER *v.* ADA TUCKER.

1. HUSBAND AND WIFE. *Action by wife against one inducing her abandonment. Liability of husband's father therefor.*

    A father is liable in damages to the wife of his son for maliciously persuading the son to abandon her, although not held to the rigid accountability imposed upon strangers—the gravamen of the action against a parent being malice.

2. EVIDENCE. *Conversations. Admissions.*

    In a suit by a wife against her father-in-law, for inducing her husband to abandon her, conversations between the plaintiff and defendant after the abandonment are admissible. though not in the nature of confessions by defendant, if they tend to show the motives with which defendant acted in the matter charged.

3. FEMALE WITNESS. *Character for truth. Chastity.*

    The character of a female witness for truth may not be impeached by showing her to be of probable unchaste character. (Whitfield, J., *dubitante.*) But if a party show by his own female witness that the witness was seen in a brothel, and facts tending to show that she was entrapped therein by his adversary, the whole matter may be inquired into.

4. INSTRUCTION. *Juries not judges of the law.*

    An instruction that the jury are "the exclusive judges of the evidence. its weight and effect," is ambiguous. If the word "effect" embraces legal effect, the instruction is wrong.

FROM the circuit court of Lee county.

HON. NEWNAN CAYCE, Judge.

Ada Tucker sued Albert Tucker, her husband's father, charging in her declaration that the latter had maliciously enticed, persuaded, and induced her husband, Norman Tucker, to abandon her. This charge was denied, and the case was presented to a jury. The testimony was conflicting. On the cross-examination of the plaintiff's most material witness, Immogene Hyatt, she was asked by appellant's attorney: "Were you not arrested by the police of Indianapolis, in January or February of this year, in a house of ill fame, with a man styling himself Wilson?" The court sustained an objection, and the question was not answered. Upon re-examination of the witness by plaintiff's attorney, she testified concerning her arrest, and claimed that she was entrapped by Wilson, who was a private detective employed for the purpose, and her testimony tended to show that Wilson was in the employ of appellant. After this, the appellant's attorney was denied the right to cross-examine the witness concerning the Indianapolis episode. The jury found for the plaintiff, and awarded her ten thousand dollars' damages. Appellant's motion for a new trial was overruled.

*Allen & Robins*, for appellants.

The court below erred in unduly limiting the cross-examination of the witness, Immogene Hyatt. The case mainly depended upon her testimony, and appellant should have been permitted to cross-examine her touching the "scheme" which she claimed culminated in her arrest by the police of Indianapolis in a house of ill fame.

Malice is of the essence of a suit like this against a parent, and the instructions given for the plaintiff are wrong, because they negative or obscure this essential element of the case. Chancellor Kent, the great American jurist, in one of his happiest opinions, in which he argues the question with force, shows conclusively that, before any action can be maintained against the parent, malice must be alleged and proven. *Hutch-*

*eson* v. *Peck*, 5 Johns., 195. The same doctrine is announced in *White* v. *Rose*, 47 Mich., 174. See, also, *Smith* v. *Lyke*, 13 Hun (N. Y.), 204; *Reed* v. *Reed*, 6 Ind. App., 317; *Railsback* v. *Railsback*, 12 Ind. App., 659.

The case of *Mehrhoff* v. *Mehrhoff*, 26 Fed. Rep., 13, is quite an interesting one on the subject. There a demurrer to a declaration against a father for enticing away his son was sustained because the declaration did not charge that the father had, in what he was alleged to have said to the son, imputed to the wife any offense against his marital rights. The case decides emphatically that to hold the father liable he must have made such a charge and it must have been false. This is good sense and good reason, as well as good law, for a man is only held, in ordinary transactions, to be accountable for the ordinary and necessary consequences of his acts. If a man loves his wife, no imputation against her by anyone, save of broken vows or moral turpitude, would induce him to leave her or would cause him to cease to love her. We cite the court to the following additional authorities: Schouler on Dom. Relations, secs. 64, 65, pp. 57, 58; Cooley on Torts, 228, note; Webb's Pollock on Torts, 271 and note; *Bennett* v. *Smith*, 21 Bar., 439; 31 Central Law Journal, 32, note.

*Sykes & Bristow*, on same side.

The question lying at the very foundation of the action is the "*quo animo*," or the intent of the parent in advising the child; and the presumption is always in favor of the fairness and innocence of a parent's counsel to his child. Where it is claimed that the estrangement and abandonment was caused by the advice of a parent, it is much more difficult to make out a proper case for damages than where the defendant is a third party or stranger. The line of demarcation between parental admonition and advice given from a sense of duty on the one hand, and that same counsel colored by malice on the other hand, is difficult to trace, and it must be borne in mind that all pre

sumptions are in favor of the parent's good faith. If a stranger, one not authorized to counsel husband or wife as to their marital relations, by uncalled for advice, causes an estrangement of conjugal affection, the law would stamp such conduct, though of the same nature as that which, in a parent, would be innocent or even praiseworthy, as malicious and as unlawful officiousness. The relationship of the party advising to the party advised necessarily constitutes an important factor in the process of determining the animus of the advice; a parent is given a much wider latitude in such cases than a stranger. *Hutcheson* v. *Peck*, 5 John., 196; Schouler's Dom. Rel., 57, 58; *White* v. *Ross*, 47 Mich., 172; *Mehrhoff* v. *Mehrhoff*, 26 Fed. Rep., 13; *Payne* v. *Williams*, 4 Bax. (Tenn.), 583; *Bennett* v. *Smith*, 21 Barb., 439; *Burnett* v. *Burkhead*, 21 Ark., 79; *Winsmore* v. *Greenbank*, Willes' Rep., 581.

The rules of law above stated, and so abundantly supported by well-reasoned authority, were disregarded by the court below, both in its rulings on questions of evidence and in granting the instructions given for the plaintiff.

The court certainly erred in not allowing the plaintiff's witness, Immogene Hyatt, who was the very backbone of the plaintiff's case—the *sine qua non* of its institution and maintainance—to be cross-examined concerning the " scheme " by which she claimed to have been entrapped into the brothel at Indianapolis. No better illustration of " technicality run mad " can be found than the ruling of the court below on this subject.

*Blair & Anderson*, and *Finley & Long*, for appellee.

The main question, and one vital to the case, is: Has a wife a right of action against a third person for procuring her husband to abandon her? Some courts, and some authorities, we frankly confess, hold that she has not. But we think these decisions and authorities are founded on the common law view of the personal rights of the wife, and her identity in law with the husband. These distinctions and discriminations, if ever

just and true as applied to this question, have, we think, been all swept away by legislation. The legislation of Mississippi on this subject is of a distinguished character, and that it is so is a matter of pride to every gentleman. We respectfully refer to the following authorities: *Williams* v. *Williams*, 37 Pac. Rep., 614; *Haynes* v. *Nawlin*, 129 Ind., 581; *Adams* v. *Main*, 3 Ind. App., 232; *Holmes* v. *Holmes*, 133 Ind., 386; *Railsback* v. *Railsback*, 40 N. E. Rep., 276.

Argued orally by *J. Q. Robins*, for appellant, and by *J. A. Blair*, for appellee.

WOODS, J., delivered the opinion of the court.

The action of the court below is complained of by the appellant in twenty-one assignments of error. We notice such only as are necessary to the determination of this appeal.

The sixth, seventh, eighth, and ninth assignments may be disposed of together, and briefly.

The conversations had between appellant and appellee, which, it is alleged, were improperly permitted to go to the jury, because not given notice of in the bill of particulars, occurred long after Norman Tucker had deserted the appellee, and were inadmissible as evidence showing, or tending to show, the substantive offense charged in the declaration. That offense, if ever committed, was long past, and the subsequent conversations of appellant, if offered as evidence to show the independent fact of desertion by reason of appellant's wrongful persuasion and inducement thereto, were competent, in this aspect, only if they were in the nature of confessions. That they were not of the character of confessions is plain, and, looked at as they are by complaining counsel, they were incompetent. But, looked at as evidence showing, or tending to show, the motive of appellant in his supposed wrongful action, they were competent; for, as counsel for appellant ably and correctly argue throughout their exhaustive brief, the motive of the appellant was a

question of the first importance.  If these conversations are given their fair and legitimate construction, they should be found to be helpful to the defense, for, in one of them, the appellant—the father of appellee's husband—expressed to appellee the opinion that it would be best for appellee and her husband to remain apart.  But, however a jury may regard this, we think they were competent as tending to show motive in appellant.

The tenth, eleventh, twelfth and thirteenth assignments may be properly considered together.  It was sought to show by Imogene Hyatt that she had, some time before the trial of the cause, been arrested, with a male companion, in a house of ill fame in Indianapolis, in the state of Indiana.  This the court refused to permit to be done by appellant's counsel on their cross-examination of the witness, but, on re-examination, allowed the witness to make an extensive statement as to circumstances offered to show and tending to show that, on that occasion, by the machinations of appellant and others nearly related to him, she was entrapped into that dishonorable position.  After this re-examination, appellant's counsel proposed to cross-examine the witness on this new evidence, and their request was twice refused.  That the course pursued by the court was unfair to the appellant, is manifest, and that it was essentially prejudicial to appellant, is too clear for disputation.  The witness was permitted to make quite a full statement of facts as to her being arrested in a house of prostitution, and as to her having been ''entrapped'' therein by the appellant's agency, as the necessary implication was, and then the door to all further inquiry on this line was closed, thus leaving the appellant to the mercy of the jury, branded by the witness as one who had wickedly had her entrapped into the horrible situation indicated, and whose mouth, as well as that of his accusatory witness, was absolutely shut to any defense he might have been able to make to this damning evidence against him.

Now, the character of a witness for truth may not be impeached by showing her to be of probable unchaste character, and the evidence as to Mrs. Hyatt's having been arrested in the brothel was, in the first instance, properly excluded; but the court should have continued to exclude it, and, assuredly, in common fairness, it should not have been permitted to be used by appellee to her heart's content, and any attempt to examine into it have been denied appellant. The effect of this action of the court was, we repeat, necessarily, and immensely, prejudicial to appellant.

Before proceeding now to consider the mistake of law which runs through the instructions generally, we desire to call attention to the ambiguity of the language of appellee's first charge. By it the jury were told that they were "the exclusive judges of the evidence, its weight and effect, and of the credibility of the witnesses." For appellant, it is earnestly contended that by this charge the jury were told that they were judges of the weight of the evidence and of its legal effect. In other words, that they were made judges of the law as well as of the facts. Of course, the answer of appellee's counsel is that this is not the natural or reasonable interpretation of the charge, and that by the use of the word effect, the jury were intended to be informed, and, in fact, were only informed, that they were the judges of the weight of the evidence and of its value as showing what facts might be said to be fairly established by it. That able and accomplished and upright counsel differ so widely as to the meaning of the language, makes it, at least, not amiss to suggest the obviation of this objection by other and unambiguous language on another trial.

A few general observations on the law applicable to the conduct of a parent in counseling and advising a married child, in cases of this character, will suffice to show the erroneous view which prevailed in the trial below, without considering seriatim the charges given and refused, or modified by the court.

In every suit of this character, the prime inquiry is, from

what motive did the father act? Was it malicious, or was it inspired by a proper parental regard for the welfare and happiness of the child? The instinct and the conscience unite to impose upon every parent the duty of watching over, caring for, and counseling and advising the child at every period of life, before marriage and after marriage, whenever the necessities of the child's situation require or justify such action on the parent's part. The reciprocal obligations of parent and child last through life, and the duty of discharging these divinely implanted obligations is not, and cannot be, destroyed by the child's marriage. Multiplied instances will occur to the mind in which a failure of the father to speak and to act would be regarded with horror. A daughter who has recklessly contracted an undesirable marriage with a man utterly unworthy to be the husband of a virtuous woman, against the wish and over the vigorous protest of the father, and who has, by such ill-starred union, been brought to wretchedness and humiliation and want of the ordinary comforts of life, may surely be advised, counseled, and cared for in the paternal home, even against the will and expressed wish of the unfaithful husband. The question always must be, was the father moved by malice, or was he moved by proper parental motives for the welfare and happiness of his child? In his advice, and in his action, he may have erred as to the wisest and best course to be taken in dealing with a question so delicate and so difficult, but he is entitled, in every case, to have twelve men pass upon the integrity of his intentions.

The third, fourth, and seventh instructions given for the appellee ignore this rule of law, and put the father upon the footing of a stranger who intervenes between husband and wife, and they are therefore erroneous. For the same reason, the first, ninth, eleventh, and twelfth instructions asked by appellant should have been given as asked, and without the modifications made by the court.

Cases of this character do not abound, and the present appeal

presents the question of the father's liability for the first time in our courts. The learned court, and able counsel for appellee, misconceived the liability of the parent, and held him to the rigid accountability imposed upon strangers who invade the domestic circle and separate husband and wife. See *Hutcheson* v. *Peck*, 5 Johns. (N. Y.), 195; *White* v. *Ross*, 47 Mich., 173; *Burnett* v. *Burkhead*, 21 Ark., 77; *Payne* v. *Williams*, 4 Bax. (Tenn.), 583.

*Reversed and remanded.*

WHITFIELD, J., specially concurring.

I concur in the result reached, and write only to save myself from committal to the proposition announced in the opinion in chief, that the fact that a woman is a common prostitute may not be shown to impeach her veracity. In *Smith* v. *State*, 58 Miss., 867, it is stated that the earlier rule in this state was that this could not be shown, and that these cases were overruled in Head's case, 44 Miss., 731, and Head's case was, on that point, overruled by Smith's case. There is a partial collection of the authorities in Smith's case. The English rule supports Head's case, as do many of our state supreme courts. Taylor on Ev., vol. 3, sec. 1471 and note 3; Rice on Ev., vol. 3, p. 367; *Real* v. *People*, 42 N. Y., 280. I do not now express any opinion on the point, reserving such expression for a case presenting the question for decision.