# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-IA-01074-SCT

*DR. CHARLES RONALD BRENT*

*v.*

*VENNIT B. MATHIS, II, INDIVIDUALLY AND AS
NEXT FRIEND OF VENNIT B. MATHIS, III AND
ALEXA MATHIS, MINORS*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/07/2013 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | WILLIAM EDWARD BALLARD |
| | MICHAEL J. MALOUF |
| ATTORNEYS FOR APPELLEE: | CHUCK McRAE |
| | GRETA LYNETTE KEMP |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 11/06/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., PIERCE AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. Following his divorce, Vennit Mathis, individually and as next friend of his two minor children, sued Dr. Charles Brent for tortious interference of a marriage contract, alienation of affection, and reckless infliction of emotional distress. Dr. Brent moved for summary judgment on the children's claims, but the trial court denied the motion. The Court granted Dr. Brent's petition for interlocutory appeal.

**Statement of the Facts**

¶2.    Vennit and Nicole Mathis married in October 2005; they had two children, Vennit B. Mathis III and Alexa Mathis. Vennit and Nicole divorced in August 2010, after Nicole had an affair with Dr. Charles Brent. Nicole and Dr. Brent met in December 2008 when Nicole saw Dr. Brent for neck pain. Dr. Brent performed a cervical diskectomy on Nicole in February 2009. Nicole had post-operative appointments with Dr. Brent in February and April, but she cancelled her May appointment. Dr. Brent got Nicole's cell phone number from her patient records and personally contacted her about the cancelled appointment. Nicole and Dr. Brent began talking on the phone and exchanging text messages; they eventually met in person several times. They engaged in consensual sexual relations on two occasions. After the second encounter in the fall of 2009, they did not see each other again and communicated only sporadically.

¶3.    In March 2010, Vennit discovered text messages from Dr. Brent in Nicole's phone. Vennit left immediately after the discovery and pursued a divorce. The divorce was final on August 18, 2010. Vennit then sued Dr. Brent individually and as next friend of Vennit III and Alexa, alleging tortious interference with a marriage contract, alienation of affection, and reckless infliction of emotional distress.[1] Dr. Brent moved for summary judgment on the children's claims.[2] After a hearing, the trial court denied the motion. The judge let the parties discuss only standing at the hearing. The order denying summary judgment consisted

[1] Vennit III was five years old and Alexa was three years old when Vennit filed suit.

[2] Dr. Brent's motion for summary judgment includes only three paragraphs and a list of exhibits. It states that the reasoning for the motion is set out more fully in the memorandum brief, but the memorandum brief is not included in the record. The same is true of Vennit's response in opposition to the motion.

2

of one sentence, thus, we do not have any insight into the judge's rationale on any issues. The Court granted Dr. Brent's petition for interlocutory appeal regarding the trial court's denial of Dr. Brent's motion for summary judgment as to the children's claims.

**Standard of Review**

¶4.     The Court reviews the trial court's grant or denial of a motion for summary judgment *de novo*. **Price v. Clark**, 21 So. 3d 509, 517 (¶ 10) (Miss. 2009).  Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Miss. R. Civ. P. 56(c).  The evidence is viewed "in the light most favorable to the party against whom the motion has been made." **Handy v. Nejam**, 111 So. 3d 610, 612 (¶ 4) (Miss. 2013) (quoting **Kilhullen v. Kan. City S. Ry.**, 8 So. 3d 168, 174-75 (¶ 14) (Miss. 2009)).  However, the party against whom the motion is made "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Miss. R. Civ. P. 56(e).

**Discussion**

¶5.     Dr. Brent asserts that the trial court erred in denying his motion for summary judgment as to the children's claims.  He raises four issues: (1) whether the children have standing to bring alienation of affection claims; (2) whether the children failed to meet their burden of production on their alienation of affection claims; (3) whether the children should be allowed to proceed with claims of intentional infliction of emotional distress; and (4) whether the children's claims of tortious interference with a marriage contract and reckless

3

infliction of emotional distress should be dismissed because the claims do not exist under Mississippi law.

**I. Whether the minor children have standing to bring claims of alienation of affection.**

¶6.     Dr. Brent asserts that the minor children's claim that he alienated the affection of their mother fails as a matter of law because the children lack standing to bring such a claim. Questions of standing are reviewed *de novo*. *Hall v. City of Ridgeland*, 37 So. 3d 25, 33 (¶ 23) (Miss. 2010). "Mississippi's standing requirements are quite liberal. . . . [P]arties have standing to sue 'when they assert a colorable interest in the subject matter of the litigation or experience an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" *Id.* at 33 (¶ 24) (footnote omitted) (quoting *Burgess v. City of Gulfport*, 814 So. 2d 149, 152-53 (¶13) (Miss. 2002)). For plaintiffs to establish standing based on an adverse effect from the defendant's conduct, the adverse effect suffered by the plaintiffs "must be different from the adverse effect experienced by the general public." *Hall*, 37 So. 2d at 34 (¶ 24) (citing *Burgess*, 814 So. 2d at 153 (¶ 14)).

¶7.     Dr. Brent argues that the children do not have standing, because only an aggrieved spouse has standing to bring a claim of alienation of affection. Vennit responds that alienation of affection can be used to protect the family unit, not just spouses. Dr. Brent maintains that the Court has never allowed minor children to recover against a third party for the alienation of their parent's affections. The Court has never "allowed" minor children to recover because whether minor children have standing to bring alienation of affection claims regarding their parents is a matter of first impression.

4

¶8.     Though whether children have standing for alienation of affection claims is an issue of first impression, the Court has enjoyed ample opportunity to develop its jurisprudence on the general tort over the years.  The Court has written the following about alienation of affection: "where a husband is wrongfully deprived of his rights to the services and companionship and consortium of his wife, he has a cause of action against one who has interferred [sic] with his domestic relations."  *Camp v. Roberts*, 462 So. 2d 726, 727 (Miss. 1985) (internal citations omitted), *overruled on other grounds by* ***Saunders v. Alford***, 607 So. 2d 1214 (Miss. 1992) (abolishing the tort of criminal conversation).  In 2007, the Court refused to abolish the tort on public policy grounds "in the interest of protecting the marriage relationship and providing a remedy for intentional conduct which causes a loss of consortium."  *Fitch v. Valentine*, 959 So. 2d 1012, 1020 (¶16) (Miss. 2007).[3]

> Alienation of affections is the only available avenue to provide redress for a spouse who has suffered loss and injury to his or her marital relationship against the third party who, through persuasion, enticement, or inducement, cause or contributed to the abandonment of the marriage and/or the loss of affections by active interference.

*Id.*  In every case considered by the Court, a husband or wife has brought the claim for alienation of affection.

¶9.     However, Vennit argues that "some of the earliest recognitions of alienation of affection involve claims having nothing to do with extra-marital affairs," but deal with intrusion into the family unit by an outside party.  Vennit and the dissent cite the 1896 case

---

[3] Mississippi is among only six states that still recognize the common law tort of alienation of affection.  *See* ***Fitch v. Valentine***, 959 So. 2d 1012, 1036 (¶ 83) (Miss. 2007) (Dickinson, J., specially concurring). The vast majority of states have legislatively or judicially abolished the cause of action.  *Id.* at 1035-36 (¶¶ 78-82).

of ***Tucker v. Tucker***, in which a wife sued her father-in-law and the Court recognized his potential liability for intruding on his son and daughter-in-law's marriage. The Court ultimately held that the father-in-law was not liable to his daughter-in-law for the alienation of his son's affections if that alienation was prompted by parental concern. ***Tucker v. Tucker***, 74 Miss. 93, 19 So. 955, 956 (1896). Vennit and the dissent cite ***Sivley v. Sivley***, which dealt with payment of attorneys' fees, but the underlying case on which the attorneys sought payment was a wife's suit against her mother-in-law for alienation of her husband's affection, in which the jury had awarded $30,000 to the daughter-in-law. ***Sivley v. Sivley***, 96 Miss. 134, 50 So. 552, 552 (1909). Vennit and the dissent also cite ***McRae v. Robinson***, in which a husband sued his in-laws for alienation of his wife's affection. ***McRae v. Robinson***, 145 Miss. 191, 110 So. 504, 505 (1926). Finally, Vennit cites a more recent case, in which a husband sued his wife's employer for allegedly allowing her to engage in an affair with a coworker. ***Children's Med. Group, P.A. v. Phillips***, 940 So. 2d 931, 932 (Miss. 2006). Vennit argues that the above-cited "family intrusion" cases support his position that alienation of affection claims are not limited to spouses.[4] We disagree. Although non-paramours were named as defendants, the party bringing the claim in each case was a *spouse*.

---

[4] Vennit also cites ***Stone v. Bang***, 153 Miss. 892, 122 So. 95 (1929), in which a father sued a preacher for seducing his teenage daughter and taking her away to New Orleans. The father did not bring a claim for alienation of affection. The claim was brought under a statute that specifically allowed parents to "bring an action for the seduction of a daughter," particularly for loss of services. That case is not relevant to the discussion. For the same reason, ***Ellington v. Ellington***, 47 Miss. 329 (Miss. 1872), which is cited by the dissent, is not relevant to today's discussion.

¶10. Vennit asserts that "Mississippi courts have not held that a claim of alienation of affection is specifically limited to a spouse injured through interference by a third party." While Vennit's statement is true on its face, the Court's precedent supports that the tort exists to protect the marital relationship, not the familial relationship as a whole. *See Bland v. Hill*, 735 So. 2d 414, 418 (¶ 17) (Miss. 1999) ("We believe that the marital relationship is an important element in the foundation of our society. To abolish the tort of alienation of affections would, in essence, send the message that we are devaluing the marriage relationship."); *Saunders v. Alford*, 607 So. 2d 1214, 1215 (Miss. 1992) ("The purpose of a cause of action for alienation of affection is the 'protection of the love, society, companionship, and comfort that form the foundation of a marriage. . . . The right sought to be protected is that of consortium.") (citations omitted). The Court has defined "loss of consortium" as follows:

> The interest sought to be protected is personal to the wife [husband] and arises out of the marriage relation. She [He] is entitled to society, companionship, love, affection, aid, services, support, sexual relations[,] and the comfort of her husband [his wife] as special rights and duties growing out of the marriage covenant. To these may be added the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home. All of these are included in the broad term, "conjugal rights." The loss of consortium is the loss of any or all of these rights.

*Kirk v. Koch*, 607 So. 2d 1220, 1224 (Miss. 1992) (quoting *Tribble v. Gregory*, 288 So. 2d 13, 16 (Miss. 1974)). The loss of consortium described in *Kirk* is personal to a husband and wife and does not contemplate children.

¶11. Vennit advances two arguments to persuade the Court to extend standing for alienation of affection to the children. First, he asserts that Mississippi allows for recovery

by minor children for the "loss of affection or society of a family member" due to physical injury or death, and he draws a parallel between a child's claim for alienation of his or her parent's affection through the interference of a third party and a child's claim for the loss of society and companionship under the Mississippi wrongful death statute. *See* Miss. Code Ann. § 11-7-13 (Rev. 2004). The parallel Vennit draws between a divorce and the death of a parent is misplaced. A minor child loses the affection and society of a deceased parent because that parent is *no longer living* and is, therefore, not even physically available for affection and society. A parent who has been paralyzed or otherwise significantly injured may be similarly unable to interact with and care for his child in the same manner as before the accident. By contrast, while divorce means that a child must interact with each parent at separate times and in separate homes, the parents are still available for affection, care, and society.

¶12.    Second, Vennit argues that the courts traditionally have protected the family unit from any intrusion, and he claims that it is the court's duty to "protect minors from the acts of others." He asserts that a third party who knowingly interferes with a marriage and family recognizes that children will be damaged in addition to the marriage, and he claims that Dr. Brent knew of the impact that his actions would have on Nicole and her children. The Hawaii Supreme Court summarized the basis of Vennit's claim in the 1979 case of ***Hunt v. Chang***, where an ex-wife sued her ex-husband's girlfriend for alienation of affection individually and as next friend of her minor son:

> In short, society relies on the family to perpetuate itself, and the relational interests of the child in the family have been considered legally protectable interests. A child has a right to the support, care, training, and love of both of

8

its parents, and these rights may be protected against interference by third parties.

*Hunt v. Chang*, 594 P.2d 118, 126 (Haw. 1979) (citation omitted). Ultimately, however, the Hawaii Supreme Court "join[ed] the majority of jurisdictions in holding that a minor child does not have a cause of action for alienation of affections." *Id.* at 127.[5] *See, e.g., **Hale v. Buckner***, 615 S.W.2d 97, 97-98 (Mo. Ct. App. 1981); ***Whitcomb v. Huffington***, 304 P.2d 465, 467-68 (Kan. 1956); ***Taylor v. Keefe***, 56 A.2d 768, 768-70 (Conn. 1947); ***Morrow v. Yannantuono***, 273 N.Y.S. 912, 914 (N.Y. Sup. Ct. 1934).

¶13.   Even if the Court recognized children as "beneficiaries" of their parents' marriage, as Vennit seems to imply, the implications would stretch beyond standing to sue an enticing interloper.   We find the Supreme Court of Hawaii's discussion of the implications

---

[5] Although the tort of alienation of affection has been abolished entirely in most states, prior to its abolition, many states held that children did not have standing to bring claims of alienation of affection against third parties. *See, e.g., **Hale v. Buckner***, 615 S.W.2d 97, 97-98 (Mo. Ct. App. 1981); ***Hunt v. Chang***, 594 P.2d 118, 127 (Haw. 1979); ***Roth v. Parsons***, 192 S.E.2d 659, 659 (N.C. App. 1972); ***Whitcomb v. Huffington***, 304 P.2d 465, 467-68 (Kan. 1956); ***Henson v. Thomas***, 56 S.E.2d 432, 434 (N.C. 1949); ***Taylor v. Keefe***, 56 A.2d 768, 768-70 (Conn. 1947); ***Morrow v. Yannantuono***, 273 N.Y.S. 912, 914 (N.Y. Sup. Ct. 1934).  Of the states cited here, only Hawaii or North Carolina have not abolished alienation of affection.  *Fitch*, 959 So. 2d at 1036 (¶ 83).  We have located cases from only two states in which the courts held that children could bring claims of alienation of affection: Illinois and Michigan. ***Rudnick v. Vokaty***, 406 N.E.2d 105, 107-108 (Ill. 1980); ***Russick v. Hicks***, 85 F. Supp. 281, 284 (W.D. Mich. 1949). In Minnesota, although the claim was not for alienation of affection, the supreme court affirmed a verdict in favor of a six-year-old, who sued to recover damages sustained after her mother was enticed away from the family home. ***Miller v. Monsen***, 37 N.W.2d 543, 545 (Minn. 1949).  Minnesota and Michigan have legislatively abolished alienation of affection as between spouses.  *See* Mich. Comp. Laws Ann. § 600.2901 (1961) and Minn. Stat. Ann. § 553.01 (1978).  Illinois has limited the damages that can be recovered "to the actual damages sustained" from the alleged alienation of affection.  740 Ill. Comp. Stat. Ann. 5/2 (1990). *See* the discussion in ***Fitch v. Valentine***, 959 So. 2d 1012, 1035-36 (¶¶ 78-82) (Miss. 2007) (Dickinson, J., specially concurring).

9

convincing. The ***Hunt*** Court wrote that the majority of courts, which had held that children did not have a cause of action for alienation of affection, had raised "numerous practical objections" about the alternative:

> (1) Possibility of a multiplicity of suits . . . ; (2) Possibility of extortionary litigation, for this action, always susceptible to fraud, would become even more so by virtue of its numerical increase and the relative tenuousness of the child's relationship; (3) Inability to define the point at which the child's right would cease, inasmuch as the status itself hypothesizes mutability . . . ; (4) Inability of a jury adequately to cope with the question of damages, first, because injuries like that now under discussion are hard to measure in money and courts are averse to permitting the more or less conjectural awards based on mental suffering, and second, because damages thus assessed are apt to overlap, the number and ages of children ordinarily being noted in a parent's action.

***Hunt***, 594 P.2d 118, 126 (Haw. 1979) (quoting ***Nelson v. Richwagen***, 95 N.E.2d 545, 546 (Mass. 1950)).

¶14.    Further, if allowed to bring alienation of affection claims, the children virtually become their parents' pawns to seek revenge on a former spouse's paramour.  As the Supreme Court of Arkansas wrote with clarity in a similar case, "[c]ommon sense and some knowledge of the practical affairs of life inform us that six-year-old Nick Alvin did not initiate this suit." ***Lucas v. Bishop***, 273 S.W. 2d 397, 398 (Ark. 1954).  In that case, Nick Alvin (through his father, Kenneth) sued his new stepfather for alienation of affection of his mother, Wilma.  Kenneth had testified at his and Wilma's divorce trial that Wilma was a good mother and, at the time of the suit, Nick Alvin lived with his mother and stepfather. The Court wrote: "The alienation for which compensation is now sought, therefore, is not Nick Alvin's loss of his mother's love; rather, it is the father's loss of Wilma's affection and their son's supposed legal right to be reared in an atmosphere of reciprocal concern." ***Id.*** at

10

398. The Arkansas Supreme Court affirmed the trial court's grant of the stepfather's motion to dismiss. *Id.* at 399.

¶15.    Reviewing Mississippi's century-long jurisprudence regarding alienation of affection, we conclude that the Court has always regarded the tort's cause of action as one that is personal to the aggrieved spouse. Nothing in Vennit's brief convinces the Court that the alienation of *marital* affections naturally results in the subsequent alienation of *parental* affections such that a minor child might have a cause of action against the lover of the straying spouse. Though standing requirements in Mississippi are indeed liberal, we hold that minor children do not have a "colorable interest" in the alienation of one parent's affections toward the other, nor do they suffer an "adverse effect" from a defendant who is the cause of that alienation of marital affections. *Hall*, 37 So. 3d at 33 (¶ 24) (quoting *Burgess*, 814 So. 2d at 152-53 (¶ 13)). The minor children do not have standing for a claim of alienation of affection against Dr. Brent. Because we hold that the children do not have standing to pursue alienation of affection claims against Dr. Brent, we do not need to address Dr. Brent's argument about whether they have met their burden of production to survive summary judgment.

**II. Whether the minor children's claims for tortious interference with a marriage contract must be dismissed.**

¶16.    Dr. Brent contends that the children's claim for tortious interference with a marriage contract must be dismissed as a matter of law because that claim does not exist in Mississippi. Vennit did not address the point in his brief. Dr. Brent is correct that Mississippi law does not provide for tortious interference with a marriage contract, because

11

Mississippi does not recognize marriage as a contract. "It was held long ago that 'marriage itself, as a personal relation between the parties, is not a matter of contract within the meaning of the constitutional provision in reference to the inviolability of contracts.'" *Germany v. Germany*, 123 So. 3d 423, 428 (¶ 12) (Miss. 2013) (quoting *Carson v. Carson*, 40 Miss. 349, 351 (1866)). Recently, while considering an appeal from a trial court's dismissal of a claim for tortious interference with a marriage contract, the Court of Appeals stated that "Mississippi has never recognized a cause of action for tortious interference with a *marriage* contract." *Carter v. Reddix*, 115 So. 3d 851, 856 (¶ 10) (Miss. Ct. App. 2012). The Court of Appeals went on to say that it refused to "create a common-law cause of action for tortious interference with a marriage contract, because Mississippi already recognizes a cause of action for alienation of affection." *Id.* The minor children's claim for tortious interference with a marriage contract is dismissed because Mississippi does not recognize marriage as a judicially enforceable contract.

### III. Whether the trial court erred in denying Dr. Brent's motion for summary judgment and allowing the minor children to proceed with their claims of intentional infliction of emotional distress.

¶17. Like the claim for tortious interference with a marriage contract, Dr. Brent argues that the children's claim for reckless infliction of emotional distress should be dismissed as matter of law because that claim does not exist in Mississippi. The plaintiff in *Carter v. Reddix* also asserted a claim for reckless infliction of emotional distress, and the Court of Appeals held that the claim was, in fact, a claim for intentional infliction of emotional distress (IIED), based on the language in the complaint and the elements of IIED. *Carter*, 115 So. 3d at 858-59 (¶¶ 17-18). Still, the Court of Appeals declined to approach the merits

12

of the issue because the claim had been properly dismissed as barred by the statute of limitations. *Id.* at 859 (¶ 18). In an ironic twist of fate, Vennit's attorney was the plaintiff's lawyer in *Carter*. *Id.* at 853. As a result, the "Reckless Infliction of Emotional Distress" section of the complaint in *Carter*, which was quoted in that case, is identical to the language in Vennit's complaint. *Id.* at 858 (¶16).

¶18. Vennit's complaint alleged that Dr. Brent's actions evoked "outrage and disgust in civilized society." The terms are consistent with an IIED claim, as the Court has held that a plaintiff must prove that the defendant's actions "evoke outrage or revulsion in civilized society." *J.R. ex rel. R.R. v. Malley*, 62 So. 3d 902, 906 (¶ 15) (Miss. 2011). *See also Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 742 (¶ 17) (Miss. 1999) (defendant's conduct "evokes outrage or revulsion, done intentionally "); *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 658 (Miss. 1995) (same). Further, though Vennit does not address the issue of whether Mississippi recognizes reckless infliction of emotional distress, he refers to the children's claim as one for IIED in his brief. The change in title from his complaint to his brief makes sense, given that Vennit's attorney was also the attorney in *Carter*, which was handed down after the instant case was filed. Vennit filed his complaint in 2011, and the Court of Appeals handed down *Carter* in 2012. We consider the claim as one for IIED, as the Court of Appeals did in *Carter*.

¶19. Even viewing the claim as one for IIED, Dr. Brent asserts that the children's claim cannot survive summary judgment because they have failed to produce sufficient evidence, and because their IIED claims are based on their mother's consensual relationship with him. The party moving for summary judgment carries the burden of showing that no material fact

13

exists and the non-moving party enjoys the benefit of the doubt regarding the existence *vel non* of a material fact. ***Monsanto v. Hall***, 912 So. 2d 134, 136 (¶ 5) (Miss. 2005). However, the non-moving party has his own burden to carry: he must establish the existence of the essential elements of his case. *See **Karpinsky v. American Nat'l Ins. Co.***, 109 So. 3d 84, 89 (¶ 11) (Miss. 2013); ***Buckel v. Chaney***, 47 So. 3d 148, 153 (¶ 12) (Miss. 2010). Defendants who move for summary judgment "carry the initial burden of *persuading* the trial judge that no issue of material fact exists[,]" then the plaintiffs have "the burden of *producing* sufficient evidence of the essential elements" of their claims just as they would be required to "carry the burden of production at trial." ***Karpinsky***, 109 So. 3d at 89 (¶ 13). Thus, the minor children here carry the burden of production on summary judgment, just as they would have carried the burden of production at trial.

¶20. At trial, the children would have to prove the following to succeed on their IIED claim: (1) Dr. Brent acted willfully or wantonly toward the children by engaging in an extramarital affair with Nicole; (2) Dr. Brent's actions evoke outrage or revulsion in civilized society; (3) Dr. Brent directed his actions at or intended to harm the children; (4) the children suffered severe emotional distress as a direct result of Dr. Brent's actions; and (5) such resulting emotional distress was foreseeable from Dr. Brent's intentional actions. *See **J.R. ex rel. R.R. v. Malley***, 62 So. 3d 902, 906-07 (¶ 15) (Miss. 2011). *See also **Pierce v. Cook***, 992 So. 2d 612, 626-27 (¶ 43) (Miss. 2008). The Court has held that "meeting the requisites of a claim for intentional infliction of emotional distress is a tall order in Mississippi." ***Speed v. Scott***, 787 So. 2d 626, 630 (¶ 19) (Miss. 2001) (quoting ***Jenkins v. City of Grenada***, 813 F. Supp. 443, 446 (N.D. Miss. 1993)). The defendant's acts must be "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Speed*, 787 So. 2d at 630 (¶ 19) (quoting *Pegues v. Emerson Elec. Co.*, 913 F. Supp. 976, 982 (N.D. Miss. 1996)).

¶21.    The children have not satisfied the burden of production for their IIED claim such that they could survive summary judgment.  First, they have not produced any evidence that Dr. Brent acted "toward" the children by maintaining an affair with their mother.  Vennit asserts that Dr. Brent's actions were "directed at the sanctity of the marriage as well as the sacred relationship of the family."  However, that is not the standard.  The requirement is that Dr. Brent's actions must have been directed toward the children, who must have personally suffered injury to bring the claim.

¶22.    Second, looking at elements two and three of the tort, Vennit makes much of the "destruction" of the Mathis family unit because of the divorce.  However, the Court is required to focus its analysis on the defendant's conduct, not the plaintiff's reaction.  "[I]t is the nature of the act itself – as opposed to the seriousness of the consequences – which gives impetus to legal redress."  *Adams*, 744 So. 2d at 742 (¶ 17); *Leaf River*, 662 So. 2d 658.  Vennit claims that Dr. Brent's text messages to Nicole and his comments under oath were "more than outrageous and revolting; they are downright sickening."  True as that may be, the flaw in Vennit's argument is that the comments were not directed at the children – the comments were directed at attorneys during his deposition, and the text messages were directed at Nicole, who presumably did not find them "outrageous or revolting," as she chose to engage in the affair.

15

¶23. Third, the children were not deposed, and the record does not contain any information regarding counseling that they may or may not have undergone following their parents' divorce. The only references in the record to the children's alleged emotional distress are found in Vennit's deposition. Vennit's vague statements about his children being "all tore up" because of the "bad set of circumstances" simply do not reveal the severity of his children's alleged emotional distress and, therefore, cannot satisfy the children's burden of production to survive summary judgment. Even where cases of IIED have passed the summary judgment phase and gone on to trial, the Court has held that "two sentences out of the entire transcript offered in support of this claim [for mental anguish] are hardly enough evidence to support a verdict" of more than $3,000 in damages. *Morrison v. Means*, 680 So. 2d 803, 807 (Miss. 1996). Where a plaintiff testified about his lack of sleep and general worry at trial due to shoddy construction of his home, the Court similarly held that such "vague testimony . . . was insufficient to support an instruction or award of damages for emotional distress." *Adams*, 744 So. 2d at 744 (¶ 22).

¶24. Finally, as to the last element, Vennit asserts that the children's emotional distress "was foreseeable, as admitted by [Dr. Brent] in his own deposition." Vennit cites the following exchange from Dr. Brent's deposition:

> Q: . . . [Y]ou have seen how [an affair] can destroy the – and cause grievous mental and emotional distress?
>
> A: Yes.
>
> Q: And you also know that this can cause and have a problem with the kids involved in that marriage too, don't you?
>
> A: Yes.

Q: Where kids have both parents and live together and support and now the parents and the kids live in two different houses; it can cause that problem too?

A: A divorce can, yes.

Based on the above-quoted statements, Vennit argues that Dr. Brent knowingly caused severe emotional distress to the minor children, and he maintains that the above-quoted exchange from Dr. Brent's deposition is enough to satisfy the burden of proof on summary judgment. Dr. Brent did acknowledge that an affair, generally, and a divorce may foreseeably result in the children having "problems." However, at the time of the affair – the affair being the conduct that Vennit argues was outrageous and malicious and directed toward the children – Vennit III was three years old and Alexa was one or two years old. Dr. Brent did concede foreseeability of "problems" following a divorce, but the foreseeability of emotional distress – based strictly on the affair – to the children seems unlikely, given their ages at the time.

¶25.    We hold that no genuine issue of material fact exists regarding the children's claims for IIED. Though the summary judgment phase occurs before the start of the trial, non-moving plaintiffs still carry a burden of production for the elements of their claims. *Karpinsky*, 109 So. 3d at 89 (¶ 13). In the instant case, the children have not produced sufficient evidence of the elements of their IIED claims. Therefore, the trial court erred in denying Dr. Brent's motion for summary judgment on the children's IIED claim.

## Conclusion

¶26.    We hold that the trial court erred in denying Dr. Brent's motion for summary judgment on the minor children's claims. Even though Mississippi's standing requirements

17

for civil lawsuits are quite broad, children in general simply do not have a colorable interest in alienation of affection litigation. Given that Mississippi does not view marriage as a judicially enforced contract, the children's claim for tortious interference with a marriage contract is dismissed. Finally, the children have failed to produce sufficient evidence to support a claim of IIED. The trial court's denial of Dr. Brent's motion for summary judgment as to all of the minor children's claims is reversed.

¶27. **REVERSED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND KING, JJ.**

**KITCHENS, JUSTICE, DISSENTING:**

¶28. No law of this State precludes minor children from bringing claims of alienation of affection against interlopers whose misconduct interferes with familial harmony. I would hold that the minor children in the present case have standing to pursue alienation of affection claims against Dr. Brent, and I respectfully dissent from the majority's decision to the contrary.

¶29. My colleagues in the majority say that "[n]othing in Vennit's brief convinces the Court that the alienation of *marital* affections naturally results in the subsequent alienation of *parental* affections such that a minor child might have a cause of action against the lover of the straying spouse." (Emphasis in original.) But those learned justices assume that the tort of alienation of affection is aimed only at protecting the marital relationship and not the family relationship as a whole. Of course, it is not the parental affection for the child which is lost when familial harmony is disrupted by a third party. It is the family unit, that children

18

of the marriage are entitled to enjoy, which is damaged by the pernicious interloper. And those children, unjustly harmed by the diminution of *familial affection*, ought to have standing to bring alienation of affection claims against the party whose wrongful conduct proximately caused or contributed to the dissolution of the family.

¶30. It is true, as the majority posits, that "[i]n every case considered by [this] Court, a husband or wife has brought the claim for alienation of affection." But this Court's not having entertained the question previously does not foreclose our serious and open-minded consideration of the possibility that children also have standing to prosecute such a claim. Our early alienation of affection cases, in which this Court allowed relief where third parties had interfered with familial harmony, lend strong support to Vennit's argument that children ought to have standing to bring claims against offenders who harm or destroy previously harmonious families.

¶31. One case to which Vennit points the Court is that of *Tucker v. Tucker*, 74 Miss. 93, 19 So. 955 (1896), in which this Court recognized a father-in-law's potential liability for intrusion into the marriage of his daughter and son-in-law. The 1909 case of *Sivley v. Sivley*, 96 Miss. 134, 50 So. 552, 552 (1909), involved a jury verdict in favor of a wife for alienation of affection where it was proven that the wife's mother-in-law had alienated her son's affection for his spouse. Likewise, in *McRae v. Robinson*, 145 Miss. 191, 110 So. 504, 505, 507 (1926), a husband successfully sued his parents-in-law and other third parties for alienation of his wife's affection, though the case was reversed on appeal because the jury had not been instructed that the actions of the third parties had to have been malicious. More recently, a case in which a husband sued his wife's employer for alienation of affection

19

where it was alleged that the employer "recklessly [had] allowed her and a coworker to engage in an extramarital affair in the workplace" survived the defendant's motion to dismiss in the trial court. ***Children's Medical Group, P.A. v. Phillips***, 940 So. 2d 931, 932, 936 (Miss. 2006). This Court affirmed the trial court's denial of the motion to dismiss: "We are unable to say, as a matter of law, that there are no possible facts which could result in CMG's liability for alienation of affections." ***Id.*** at 935.

¶32. This Court liberally has permitted spouses alleging alienation of affection to bring claims against third parties other than paramours. It never has limited such causes of action to paramours as defendants, but rather has recognized that *any* kind of intrusion into the marriage is actionable by the spouse who is alleged to have been robbed of the affection of his or her spouse. Yet today's majority declines to recognize that children likewise affected by the intrusion of a third party into the family unit ought to have standing to bring suit for the alienation of familial affection. The majority acknowledges that "[a]lthough nonparamours were named as defendants, the party bringing the claim in each case was a *spouse*." (Emphasis theirs.) The majority continues: "the Court's precedent supports that the tort exists to protect the marital relationship, not the familial relationship as a whole." I respectfully disagree, finding no prior decision of this Court precluding claims by children thus damaged. The majority's exclusion of children strikes me as oddly harsh, as there is, in my mind, a sound and highly credible argument to be made that children often are the most innocent, the most vulnerable, and the most grievously injured victims of familial wreckage.

¶33. The Court, however, squarely has addressed cases in which parents sued to recover for the loss of the society, affection, and services of children, which are analogous to

alienation of affection claims. In ***Ellington v. Ellington***, 47 Miss. 329, 344, 1872 WL 6171

1872), this Court considered "the wrong done the parent in the seduction of his child."

According to the Court, "[t]his form of action, was early accepted– grounded on the [ancient]

idea that the daughter bore the relation of a servant to the parent; the declaration alleging,

'*per quod servitum amisit*.'"[6] ***Id.*** The Court opined, "[t]he value of the society or services of

a daughter consists very much in the innocence and purity of her person and character, and

are greatly depreciated in consequence of her defilement, which not unfrequently occasions

their total loss." ***Id.*** at 353. Though the claim in ***Ellington*** was not one for alienation of

affection, the loss of society or services of the daughter and the impact on the family of her

defilement clearly were seen as actionable in Nineteenth Century Mississippi. To this day,

that case has been neither overruled nor modified.

¶34.    Similarly, more than fifty years later, in ***Stone v. Bang***, 153 Miss. 892, 122 So. 95,

95, 96 (1929), a father sued a preacher who had seduced the man's daughter and taken her

to New Orleans, and this Court upheld a $2,000 verdict against the wicked vicar. But the

majority finds "[t]hat case  not relevant to the discussion," since "[t]he claim was brought

under a statute[7] that specifically allowed parents to 'bring an action for the seduction of a

daughter.'" ***Id.*** at 95. I respectfully disagree, finding the case highly relevant to the

---

[6]"Whereby he lost the services (of his servant)." *Black's Law Dictionary* 1323 (10th ed. 2014).

[7] According to ***Stone***, that statute was "section 720, Code of 1906 (Section 514, Hemingway's 1927 Code)." ***Stone***, 122 So. at 95. The current version of this statute is Mississippi Code Section 11-7-11 (Rev. 2004) ("A parent may bring an action for the seduction of a child, although such child be not living with nor in the service of the plaintiff, and though there be no loss of service . . . .")

discussion. The statute, consistent with the common law rule articulated in *Ellington*, made actionable any interference in the familial relationship between parents and a daughter. If parents could sue for the loss of the society or services of a child, then conversely the logic of the common law provides a child a cause of action for the intrusion of a third party into the family relationship.

¶35.    As the majority notes, alienation of affection actions protect, among other things, "the right to live together in the same house, to eat at the same table, and to participate together in the activities, duties and responsibilities necessary to make a home." *Kirk v. Koch*, 607 So. 2d 1220, 1224 (Miss. 1992) (quoting *Tribble v. Gregory*, 288 So. 2d 13, 16 (Miss. 1974)). The majority opines that "[t]he loss of consortium described in *Kirk* is personal to a husband and wife and does not contemplate children." I disagree.  Entitlement to sexual relations, of course, is a right exclusive to the marriage. But "society, companionship, love, affection, aid, services, support," additionally constitute the rights to consortium contemplated in *Kirk*. They are not all, as the majority contended, "personal to a husband and wife." The marital children share in many valuable familial rights. The loss or reduction of those familial rights, as in *Ellington* and *Stone*, ought to be actionable by marital children.

¶36.    While Mississippi has not previously addressed standing of children to bring claims of alienation of affection against a parent's paramour, other courts have. The Appellate Court of Illinois held that the tort of alienation of affection "involve[s] the rights which *all members* of the family have a right to protect" and that "the State likewise has an interest in the sacredness of the family relationship." *Johnson v. Luhman*, 330 Ill. App. 598, 71 N.E.2d 810, 812-13 (1947) (quoting *Heck v. Schupp*, 394 Ill. 296, 68 N.E.2d 464 (1946)) (emphasis

22

added). That court continued: "As against the world at large a child has an interest in the relation (with his parents) because of the support he may expect. . . . Also, he has an interest in the security and affection of the parent, at least while he remains in the household. . . ." *Johnson*, 71 N.E.2d at 813 (quoting Roscoe Pound, *Individual Interests in the Domestic Relations*, 14 Mich. L. Rev. 177, 185 (1916)). Ultimately, the court there held the following:

> Defendant's conduct resulted in the destruction of the children's family unit–that fortress within which they should find comfort and protection at least until they reach maturity–and deprived them of the unstinting financial support heretofore contributed by their father, as well as of the security afforded by his affection and presence."

*Johnson*, 71 N.E.2d at 814. *See also **Daily v. Parker***, 152 F.2d 174, 177 (7th Cir. 1945) ("[A] child today has a right enforceable in a court of law, against one who has invaded and taken from said child the support and maintenance of its father, as well as damages for the destruction of other rights which arise out of the family relationship and which have been destroyed or defeated by a wrongdoing third party.").

¶37. Additionally, the Supreme Court of Minnesota considered the question "whether a minor child has a cause of action against one enticing its parent from their family home to recover damages sustained as a result of the enticement." ***Miller v. Monsen***, 228 Minn. 400, 401, 37 N.W.2d 543 (1949). The court answered in the affirmative, stating that:

> It is the foundation of civil society, sanctioned as such by both civil and ecclesiastical authority. It provides not only shelter, food, comfort, family life, happiness, and security for its members, but also instruction in, and example of, virtue, morality, and character. Not only the permanent welfare of the human race, but also the great advances of civilization, such as the elevation of woman to social equality, the education of children, the refinement of manners, the awakening of the finer things and subjugation of the gross in man, may be directly traced to it as an institution. Human Society could not endure without it.

23

*Id.* at 402. The United States District Court for the Western District of Michigan held that "a child has legally protected rights in the maintenance of the family relationship against interference by outsiders, and that enticement by an outsider of the parent from the family home constitutes an invasion of the child's rights, for which it may maintain an action for damages." *Russick v. Hicks*, 85 F. Supp. 281, 285 (W.D. Mich. 1949).

¶38. The majority, however, argues that "in Minnesota and Michigan, alienation of affection has since been legislatively abolished." That may be so. But *Miller* did not involve an alienation of affection claim. And in *Russick*, the court noted that the childrens' suit "is not the traditional alienation-of-affections suit–it is an action to recover damages for a direct wrong to the infant plaintiffs, that is, the wrongful invasion of their family relationships and the loss of the benefits therefrom." *Russick*, 85 F. Supp. at 286. That court continued that it "is convinced that the above statute [abolishing the alienation of affection cause of action] did not abolish, and does not bar, the right of action asserted by the plaintiffs in the present case." *Id.* at 287. The cases merely demonstrate situations in which other courts have allowed recovery to children on the basis of intrusion into the family. I find the authority persuasive to the extent that it establishes a sound, albeit minority, precedent for allowing children to bring claims against an interloper whose conduct resulted in familial discord.

¶39. The majority further opines that Vennit's analogy of alienation of affection to the context of wrongful death is misplaced: "[a] minor child loses the affection and society of a deceased parent because that parent is *no longer living* and is, therefore, not even physically available for affection and society." (Emphasis in original.) But, again, the majority's distinction is based on the erroneous assumption that alienation of affection exists

24

solely to protect the marital relationship, and not the familial relationship as a whole. I reject that premise. In the context of an alienation of affection claim, the family unit is dead, much like a deceased parent in the context of a wrongful death claim. The society and companionship of the *family* as a unit, and not merely that of the enticed parent, forever is lost.

¶40.    This Court expressly has upheld the claim of alienation of affection: "[I]n the interest of protecting the marriage relationship and providing a remedy for intentional conduct which causes a loss of consortium, this Court declines the invitation to abolish the common law tort of alienation of affections in Mississippi." ***Fitch v. Valentine***, 959 So. 2d 1012, 1020 (Miss. 2007). The Court continued:

> Alienation of affections is the only available avenue to provide redress for a spouse who has suffered loss and injury to his or her marital relationship against the third party who, through persuasion, enticement, or inducement, caused or contributed to the abandonment of the marriage and/or the loss of affections by active interference.

***Id.***

¶41.    Alienation of affection is a common law tort, never enacted by the legislature, but judicially recognized by this Court as early as 1896 in the case of ***Tucker v. Tucker***, 74 Miss. 93, 19 So. 955 (1896). *See* David Neil McCarty, *Love in Vain: The Social Value of Mississippi's Alienation of Affection in Protecting Marriage*, 31 Miss. C. L. Rev. 107, 111 (2012) ("The first reported alienation of affections case rears its head in 1896, although it is clear from the text of the case that the tort was known even before that date.") Since alienation of affection is a creature of jurisprudence, this Court is at liberty to expand it. *See* ***Yazoo & M.V.R. Co. v. Scott***, 108 Miss. 871, 67 So. 491, 493 (1915) (quoting ***Western***

25

*Union Telegraph Co. v. Allen*, 66 Miss. 549, 6 So. 461, 463 (1889)) ("The courts then [that is, in the early history of English law], as the courts now, conscious of the needs of the public, expanded the principles of the law, [and] fitted them to the exigencies of the occasion . . . .") I advocate for an expansion of the common law tort of alienation of affection to include children and to protect not only the marital relationship, but also the important relationship of the family itself. An interloper's misconduct adversely affects not only the wronged spouse, but also the children whose right to familial harmony and stability ought to be recognized and protected by the judicial branch of Mississippi's government.

¶42.    Because I would affirm the chancellor's denial of summary judgment to Dr. Brent, I respectfully dissent.

**CHANDLER AND KING, JJ., JOIN THIS OPINION.**